D. S. KNOLES, Respondent, v. SOUTHWESTERN BELL TELEPHONE COMPANY, a Corporation, Appellant.*

Kansas City Court of Appeals. June 23, 1924.

1. **RELEASE: Release of One Joint Tort-feasor Does Not as a Matter of Law Release Others Unless Release is Given in Full of All Claims Arising from the Injury.** Under section 4223, Revised Statutes 1919, release as to one joint tort-feasor does not as a matter of law release others whose negligence also caused the injury, unless release is in full of all claims arising from the injury, constituting settlement of cause of action against all.

2. **————: Release in Full of All Claims Against Named Defendant Held Not to Release Joint Tort-feasor Whose Negligence Also Caused Injury.** Under section 4223, Revised Statutes 1919, release "in full of all claims of every kind and character against the said defendant," *held* not release of joint tort-feasor, though release recited it was made to forever settle claim.

3. **MASTER AND SERVANT: Negligence: Electricity: Proximate Cause: Failure to Warn Held Not Proximate Cause of Injury to Employee Who Knew of Danger.** Failure of telephone company to warn plaintiff who was engaged in trimming trees that electric light company's wires passing through trees carried heavy charge of electricity, *held* not proximate cause of injury particularly where evidence showed that plaintiff knew he must avoid contact with all electric wires.

4. ———: ———: Where Danger of Injury to Employee is Known to Him, Failure to Warn is Not Proximate Cause Thereof. Failure to warn will create liability for an injury where the danger is not known and recognized but such rule does not apply where it is known or where plaintiff had no need of warning, for in such instances the omission to warn is in no sense the proximate cause of the injury.

5. ———: ———: Negligence of Telephone Company in Failing to Notify Light Company to Turn off Current in Wires While Trees Were Being Trimmed Held Not Proven. Telephone company *held* not negligent in failing to notify light company to turn off current in wires strung through trees which were being trimmed for telephone company by plaintiff, in absence of evidence of necessity thereof, or that plaintiff relied on any arrangement so to do, or made any request that current be turned off.

6. ———: ———: Employee Experienced in Trimming Trees Held Guilty of Contributory Negligence in Not Seeing and Avoiding Electric Wire. Where employee experienced in trimming trees, through which electric wires passed, knowing he must do his own inspecting in looking therefor and avoiding the same, *held* guilty of contributory negligence in not seeing highly charged wire in tree through which it passed only about a foot distant from two wires which he saw.

---

*Headnotes 1. Release, 34 Cyc., p. 1087; 2. Release, 34 Cyc., p. 1087; 3. Master and Servant, 39 C. J., Section 612; 4. Master and Servant, 39 C. J., Section 609; 5. Master and Servant, 39 C. J., Section 452; 6. Master and Servant, 39 C. J., Section 1044.

Appeal from the Circuit Court of Pettis County.—*Hon. Dimmitt Hoffman*, Judge.

REVERSED.

*Montgomery & Rucker* for respondent.

*Battle McCardle, George F. Longan, Earl H. Painter, Joseph W. Jamison* and *George B. Whissell* for appellant.

TRIMBLE, P. J.—While at work in the city of Sedalia, trimming trees to prevent the branches touching defendant's telephone lines, plaintiff came in con-

tact with an electric wire belonging to the City Light & Traction Company and was badly shocked, burned and caused to fall from a tree to the ground, being thereby severely injured.

He brought suit against the Light Company for $15,000 damages, based upon its alleged negligence in failing to keep the wire properly insulated, but later settled with that Company for $2000, as will more particularly hereinafter appear.

Thereafter he brought the present suit against the Telephone Company, seeking to recover the sum of $10,000 from it.

The defendant, among other defenses, set up the written stipulation made by plaintiff with the Light Company and the receipt by him of $2000 thereunder, claiming that the same was in full settlement of plaintiff's entire cause of action and was therefore a bar to any recovery herein.

The trial court refused to adopt this view and submitted the case to the jury, overruling defendant's demurrers based not only on the above contention but also on the ground that, aside from this, plaintiff, on the merits, was not entitled to recover. The jury returned a verdict in plaintiff's favor for $2500 on which judgment was rendered; and from this defendant has appealed. Judge BLAND, to whom the case was originally assigned, is of the opinion that the plaintiff's settlement with the Light Company is a bar to any recovery herein, but neither of his associates are able to concur in such view.

It is conceded that plaintiff executed the stipulation with the Light Company and received from it the $2000 specified therein; but there is no evidence that as a matter of *fact* the same was understood or intended as a release of all claims and demands arising out of plaintiff's *injury*, i. e., a full satisfaction and discharge of plaintiff's cause of action. The contention is that the

release given to the Light Company bars recovery against the Telephone Company as a matter of *law*.

The stipulation and agreement made with the Light Company is as follows:

"In the Circuit Court of Pettis County, Missouri.

"February Term, 1923.

"D. S. KNOLES, Plaintiff,

v.

"CITY LIGHT & TRACTION Co., Defendant.

"Whereas on the 22d day of July, 1922, D. S. Knoles, the above-named plaintiff, while engaged in trimming limbs from a tree near the intersection of an alley with Grand Avenue between Fourth and Fifth streets in the City of Sedalia, Missouri, was severely shocked, burned, and injured by reason of coming in contact with a high tensioned electric wire belonging to the above-named defendant, and whereas, the said Knoles instituted an action at law at the October term, 1922, of the circuit court of Pettis county, Missouri, wherein he sought to recover damages on account of said injury, and whereas, said City Light & Traction Company, the above-named defendant, filed an answer denying any and all liability by reason of said injury to the said Knoles and, whereas, the said Knoles is demanding the sum of fifteen thousand dollars by way of damages, and the said City Light & Traction Company denies that it is liable for any damage. Now, in order to compromise, adjust and forever settle the claim of the said Knoles on account of said injury, it is hereby stipulated and agreed by and between the parties that the City Light & Traction Company will pay to the said Knoles, receipt of the payment being hereby acknowledged, the sum of two thousand dollars in full of all claims of every kind and character against the said defendant, and the said Knoles accepts the two thousand dollars in full of all his claims and demands."

Section 4223, Revised Statutes 1919, contains the following provision, added thereto by Act approved March 23, 1915, Laws 1915, p. 268, to-wit:

"It shall be lawful for all persons having a claim or cause of action against two or more joint tort-feasors or wrongdoers to compound, settle with, and discharge any and every one or more of said joint tort-feasors or wrongdoers for such sum as such person or persons may see fit, and to release him or them from all further liability to such person or persons for such tort or wrong, without impairing the right of such person or persons to demand and collect the balance of said claim or cause of action from the other joint tort-feasors or wrong-doers against whom such person or persons has such claim or cause of action, and not so released."

Prior to the above enactment, the release of one joint tort-feasor released the others as a matter of law, regardless of the intention of the parties to the release. [Dulaney v. Buffum, 173 Mo. 1, 16.] But the above quoted amendment to the statute has changed this except where the settlement and release is in full of all claims arising out of the injury, it, in such case, being a settlement in full of the cause of action. Of course, if a *cause of action* be satisfied and released, it is dead and cannot be revived and used against another wrong-doer, for it has become extinct; and that situation is not helped in the least by the above-mentioned amendment.

But the release here in question seems to me to be vitally different from that in the case of Abbott v. City of Senath, 243 S. W. 641. In that case, Abbott settled with the owner of the awning which fell upon him, and gave to said owner a release or *receipt in full* for all damages arising out of his *injury*, i. e., arising out of his cause of action. Even on the idea that it was a settle-ment merely of Abbott's claim *against said awning own-er,* still, as said in the opinion, there was nothing in the language of the release "to indicate *even by implication* that Abbott was claiming or demanding *anything less* than the *full amount* for which it was liable to him." (Italics mine.) In other words, there was nothing whatever to show, or to even *imply,* that the release given

was for anything less than *in full* for *everything* he had suffered or was claiming as a result of the *injury*, especially as the awning owner, if liable at all, was liable for the full damage even though the city might also be liable. Moreover, the receipt explicitly stated that Abbott accepted the $500 "in full of all demands from *injury* received by the falling of awning," etc. (Italics mine.)

As he was being paid in full for all demands arising from the injury, this would include demands against everyone through whose negligence that injury was caused, and the release would therefore be in settlement of his cause of action against all. This, I think, is what is meant in the Abbott case when it is said (l. c. 643) "the recital in general terms that the money was received in full of all demands for his *injury*, without any limitations or reservations whatever, clearly indicates that Abbott considered that he had effected a *complete* settlement, and that he was thereby acknowledging, and intending to acknowledge, satisfaction in full of his *cause of action*." (Italics mine.) His "cause of action" would include claims against everybody whose negligence had caused his injury, especially as no suit had been brought at that time against anyone in particular, and hence releasing his cause of action could not be understood to mean merely his claim against any particular wrongdoer. Consequently, and in view of all the above-mentioned matters, the Supreme Court held that there was no room whatever for any construction or interpretation of the receipt to mean that Abbott was merely accepting $500 in full of his demands against the awning owner *only*.

But the release in the case at bar is not thus tightly closed and hermetically sealed; on the contrary it expressed an entirely different thought. The receipt or release involved herein *shows on its face* that plaintiff was claiming and demanding *fifteeen thousand* dollars damages, but the Traction Company was insisting that *it* wasn't liable for *any* damages, and a suit was pending

as to this issue, wherefore plaintiff agreed, in compromise of that claim to accept the sum of *two* thousand dollars, not, as stated in the Abbott release, in full of all demands arising from his *injury,* but "in full of *all claims* of every kind and character *against the said defendant."*

It is true, the release theretofore recited that it was made to forever settle the claim, and thereafter said the $2000 was accepted in full of all his claims and demands, but manifestly this refers to the "claims of every kind and character *against the said defendant,"* the only claims the receipt had said it was in full settlement of, and the only claims it was dealing with.

To say, as a matter of law, that, because of such a release as the one in the case at bar, the plaintiff is not entitled to recover damages from any other tort-feasor whose negligence also caused the injury, is, to my mind, a refusal to allow any force or effect to the statute, section 4223, Revised Statutes 1919, as it now stands.

Proceeding, therefore, to the merits of the case, the petition set up that on July 22, 1922, plaintiff was directed by defendant to trim branches from trees adjacent to defendant's telephone wires in the city of Sedalia; that defendant's said wires were strung above the streets and alleys of Sedalia in *close proximity to* and *parallel with* wires of the Light Company which carried heavy charges of electricity and were highly dangerous to persons coming in contact therewith; that defendant well knew this and knew that, although said wires were insulated, such insulation was insufficient to protect a person coming in contact therewith; that plaintiff *did not know the wires* of the Light Company *were heavily charged with electricity.*

The petition further alleged that on the date above mentioned, while trimming the limbs from a tree near a certain specified point in Sedalia, plaintiff came in contact with one of the wires of the Light Company and received a shock which rendered him unconscious, se-

218 Mo. App.—16.

verely burned him and caused him to fall some fifteen feet to a stone pavement, to his great and permanent injury.

The negligence charged in the petition is:

1.   That defendant, knowing that electric wires of high voltage and insufficient insulation were in close proximity to defendant's wires, "negligently and wrongfully directed and instructed plaintiff to perform the work aforesaid *without advising* plaintiff or *warning him* that the wires of the City Light and Traction Company *carried heavy charges of electricity* and were dangerous to persons who might come in contact therewith."

2.   That although defendant had an understanding and agreement with the Light Company whereby the latter would shut off the current from the wires in close proximity to defendant's wires when defendant would have persons trimming limbs adjacent thereto, yet defendant "negligently failed to notify the City Light & Traction Company on the 22nd day of July, 1922, that persons were engaged in trimming trees as aforesaid and thereby unnecessarily and negligently exposed plaintiff to the danger of coming in contact with the high voltage wires of the said Company at a time when the current was passing along and through said wires."

Defendant's amended answer, in addition to the defense heretofore considered, contained a general denial and a plea of contributory negligence in that plaintiff knew of the presence and character of said wires or could have known same by the exercise of ordinary care for his own safety and failed to exercise ordinary care to look and see.

The amended answer further set up that plaintiff was not an employee of defendant but of Luther Knoles, an independent contractor having the work of trimming trees in charge, and that no relation existed between plaintiff and defendant.

There is no question but that Luther Knoles, a son of plaintiff, had the contract to trim the trees along forty-five miles of defendant's telephone line, which por-

tion began at or in the town of Windsor and extended to and through the city of Sedalia to some designated point beyond; that Luther Knoles was an independent contractor in doing this work, and that plaintiff, who was nearly seventy years of age but hale and vigorous, worked for his son.

Plaintiff's evidence is that plaintiff was living at Windsor and had lived there for twenty-nine years, and for nine years or more had been a lineman for the telephone company there; that for six or eight years prior to getting hurt, he was principally, or for a part of that time at least, engaged in trimming trees, doing this for individuals and for whomever wanted such work done; that he worked at this in various small towns, but this was the first time he had ever engaged in trimming trees for telephone companies in a city of the size of Sedalia. He said that in working thus in the other towns he had not worked ''very much'' around ''high tension wires;'' that when he went among the wires at Clinton, they, the telephone as well as the light man, always notified him to ''look out, you are going to get into hot wires;'' that he had never worked in Sedalia before and had been there but a few times.

The evidence offered in plaintiff's behalf further discloses that the work of trimming the trees under the son's contract began in Windsor and went toward Sedalia, arriving at the city limits on the evening of July 21, 1922; that when they reached that point, an attempt was made to get released from that part of the contract which involved trimming trees in Sedalia, but defendant would not agree to release that part of said contract. While it is true the *son* was the one who sought to obtain release, and in his testimony says that it was partly because of fear of some vague and undefined danger but more because he found he could not burn the brush on the streets where it was cut but would have to haul it out of the city before burning it, yet the evidence of plaintiff himself discloses that the son discussed with him the advisability of getting released from trimming

trees in Sedalia not merely because of the difficulty of disposing of the brush but also because they wanted "to *keep out of the hot wires.*" And plaintiff says *he himself* made this suggestion to his son.

On the morning of July 22, 1922, plaintiff and his son went to defendant's office in Sedalia and were taken from there by the man in charge, in an automobile, to a certain point in the city where a pole was pointed out as "pole No. 1" and plaintiff was told by said man, "here is where you begin" and his instructions were to follow, in his work of trimming trees, the telephone line around to the telephone office. The evidence in plaintiff's behalf is that nothing was said to him about electric wires or the danger or likelihood of coming in close proximity to or in contact with high voltage wires; that plaintiff began work about 7:30 a. m. and reached the tree in which he was injured somewhere between ten and eleven; that he followed the line, trimming trees as he went, for a block-and-a-half until Grand Avenue was reached, at which point the telephone lines turned south and continued south on Grand Avenue until it passed the home of a Mr. Jolly, at the corner of which stood the poplar tree in which plaintiff was injured; that near the point where the line came to Grand Avenue was a big elm tree which plaintiff climbed and began trimming; that in the course of trimming this tree, plaintiff's back touched an electric wire and he received a "slight shock" or a "little dab," which, though uncomfortable, did not burn or harm him; that shortly afterward plaintiff's son came to the tree and, seeing that there was still one more limb to be cut from the tree, called to his father to come down and let him, the son, cut it as he, plaintiff, might fall. While there might possibly be room for an inference that the son called to the father, fearing that he might get shocked by coming in contact with the wire, yet we cannot say that conclusively such was the case, but must accept the evidence as above shown, namely, that the father, in the son's absence, touched the wire and got a little "jab" in the back and that thereafter the son came up and cut the

other remaining limb, fearing that his father might fall. It is conceded, however, that plaintiff told his son of receiving the shock and that the son shortly before that had told him to "be careful about light wires."

Plaintiff testified he didn't know anything about the voltage of the wires; that the wire he touched in the elm tree was "a small looking wire, I supposed a 212 or something like that." When asked if he "ever had any experience at any place in working among 2300-volt wires when they were hot?", he replied, "No, sir; *nothing on the line,* no, sir." Just what this enigmatical answer means may not be clear; but it would seem to mean that no such wires had been encountered on this job up to that time.

He further testified that he didn't know how many light wires were in the big elm tree, he didn't count them but he thought there was one, that he knew it was a light wire because it was copper. When asked on cross-examination if this light wire in the elm tree ran to Jolly's tree, he first said the "lead seemed to run west." When asked if after it finally got to Grand it turned and went through Jolly's tree, he said, "I don't know about that, but we followed the line around, that is what we went by, keeping tab of the Bell (telephone) line and trimming it up." When asked what he did, between the elm tree and the place he got hurt, to keep track of the light wires as he went along, his reply was: "We was keeping track of our work. We wasn't supposed to keep track of the light wires."

But he went on and testified thereafter that, so far as he was concerned, he was trying to avoid getting on electric light wires; that after he got this "dab in the back" he went ahead with his work and when he came to anything he thought was a light wire he kept his eye on it. But he said he "didn't know as he seen any" light wires from the elm tree to Jolly's tree, and at this point he said the light wire in the elm tree "didn't run up to Mr. Jolly's tree."

Plaintiff further testified that when he reached the Jolly property he went to the house to get permission from the owner to trim the tree and that he talked to Mr. Jolly; that they both went out to the tree and he, facing north, looked up into the tree and saw two wires to the left or west side of the tree and that he asked Mr. Jolly, "Do you think them are high tension wires?" and that Jolly replied, "I don't know, I guess not, they don't look to me like dangerous wires;" that he didn't see any other wires in the tree except the five or six telephone wires to the left side thereof; that the tree had body sprouts thereon, and, as he had on his climbing spurs, he trimmed the sprouts up for a piece and then found he had left his ladder "down below a piece" so he went and got his ladder, and, coming back to the tree, placed it in position and went up it, finishing the trimming of a few remaining body sprouts to the left and then he "looked up and started to finish my job;" that he went up into the tree, and the first thing he knew he "struck something awful" and got an "awful shock" which burned him and rendered him unconscious, and when he regained consciousness he was lying in Mr. Jolly's yard; that he did not come in contact with the two light wires on the left or *west* of the tree but that the wire he touched was one close to the trunk of the tree and on the *east* side thereof; that up to the time he received the shock he had not seen this third wire and did not know it was there, but had seen the two wires only. He testified, however, that after he had sufficiently recovered from his hurt he revisited the tree, and testified that to look at either pole close to the tree you could see *three* wires, "but to *look right up in the tree,* it was awfully brushy, you couldn't hardly, without looking awfully close, see that wire I got on to."

On cross-examination, when asked if there was an electric light pole standing near Jolly's tree, he said "there was a *corner* pole right there on the *north side of that tree,* but I hadn't seen that until I got hurt that I know of, at all." When asked to explain why he didn't

notice it before he got hurt, he said, "I wasn't climbing poles, I was climbing trees," and admitted that if he had looked at it he could have seen the wire that injured him. An alley ran along the north side of Mr. Jolly's property and this corner pole stood at the north of this alley at Jolly's corner a little north of the tree in question; and plaintiff testified that the line came out of the alley and at the aforesaid corner pole the line "cornered and turned south" and he didn't "really see that corner pole until after I got hurt,"-and the reason he didn't see it was "Just because I was climbing trees and I wasn't climbing poles." "I wasn't looking . . . I wasn't thinking about a light wire jumping out." He said the pole was a twenty-five or thirty-foot pole and was distant from the tree "something like as far from here to the judge," which distance the record suggests was twelve or fifteen feet.

Plaintiff, further on cross-examination, when asked what he did to see if there were any electric wires in the tree before he went up it, said: "Oh, I saw those two over to the left as I went up, facing the north and I kept my eye on them;" that he saw two wires, but didn't know what they were but shunned them because he shunned all light wires "because I know what wires does when you come in contact with them;" he feared he would get burned or a pretty good shock if he touched them. He further said that all three of the wires, the two that he saw and the one he didn't see, ran through the tree top, and that the wire he came in contact with was "about a *foot*" or "something like that" away from the two wires he saw. He was then asked again why he didn't see the third wire before he came in contact with it and said, "I told you I didn't remember it."

"Q. Why? A. I was not climbing poles. If I had been climbing poles, of course, on the insulators you could see how many wires on the cross-arms, but I went there and went up that tree and this line running unbeknownst; I wasn't looking for them, I didn't know that wire was there, no, sir.

"Q. And having seen two light wires, you just supposed that was all there was there? A. That was all I seen. I just supposed that was all.

"Q. You didn't make any effort to see if there was any more? A. *No, because I didn't have no occasion.*"

Plaintiff was asked on cross-examination if, when talking to Jolly at the tree, the latter did not say to him, "You had better be careful, there are light wires in that tree that are uninsulated" and if he did not reply to that, "I have trimmed trees for years?" and he answered that he didn't "recollect hearing any such conversation." When asked if he would say it occurred, he replied: "I wouldn't say it didn't, but I don't recollect hearing any such conversation." Jolly testified that he told him to "be careful about the light wires up there," but, of course, as he was a witness for defendant and the jury has found for plaintiff, we can give no heed or weight to Jolly's testimony.

Luther Knoles, son of plaintiff and a witness for him, testified that his father had trimmed trees for twelve or fifteen years, had done all the Windsor trimming of trees, had trimmed some in Clinton and that these towns both had electric lights; that the elm tree where his father got his slight shock was about a block-and-a-half from where they started and that the poplar tree where he was injured was about three blocks from the elm tree.

Now, it will be observed that the petition does not say plaintiff did not know that light wires were close to the telephone wires; what is said is that the light wires were in close proximity to and parallel with the telephone wires but that plaintiff did not know they were *heavily* charged with electricity and dangerous. Some distinction apparently is sought to be made in respondent's brief between ordinary electric light wires and light wires carrying 2300 volts, and some benefit in plaintiff's behalf seems to be sought on the theory that he did not know there was any 2300-volt wires in Sedalia. We fail to see how plaintiff can derive any benefit from this distinction or claim since his own evidence shows he had

worked in Clinton where there were "hot wires;" and his evidence not only shows that he knew all electric wires were to be avoided as likely to shock and injure him, and suggested to his son that they get released from trimming trees in Sedalia in order to keep out of the hot wires, but also that he was warned by his son to be careful of electric wires. He says he could tell electric wires from telephone wires, but could not tell by looking at an electric wire whether it carried 2300 volts or not. So of course he knew he had to beware of *all* electric wires and his own evidence is that he knew he must shun all of them. Besides, his own question to Jolly, "Do you think them are high tension wires?", reveals he was aware high tension wires existed and must be guarded against. He did not touch a deadly 2300-volt wire, thinking it was a harmless wire; he came in contact with it because he did not see it and knowing full well that he should not come in contact with any electric wires.

So far, therefore, as concerns the first ground of negl gence, the failure of defendant to warn plaintiff that the Light Company's wires carried "heavy charges of e ectricity," how can it be said that such failure was a pr ximate cause of his injury? Not only does plaintiff's evidence show that he had all the warning necessary, but also that he needed no warning since he himself knew he must avoid contact with any and all electric wires. The avoidance or nonavoidance thereof was determined by whether he *saw* a wire and not by whether he thought it carried 220 volts instead of 2300 volts. To warn is of course a well-established duty, and the failure to warn will create liability for an injury where the danger is not known and recognized; but such rule does not apply where it is known or where the plaintiff has no need of warning. [Maupin v. Miller, 164 Mo. App. 149, 152.] In such instances, the omission to warn is in no sense the proximate cause of the injury. [Hirsch v. Freund, etc., Bread Co., 150 Mo. App. 162; Stegmann v. Gerber, 146 Mo. App. 104; Nugent v. Kauffman Milling

Co., 131 Mo. 241; Mueller v. Laprelle Shoe Co., 109 Mo. App. 516; 26 Cyc. 1170.]

With reference to the second specification of negligence, the failure to notify the Light Company to turn off the current, it may be said in the first place that the evidence in plaintiff's behalf goes no further than to show that there was an understanding between the two companies that in the event the Telephone linemen needed the assistance of the Light Company's employees to "help them out at all hazardous positions" they would lend their help in doing so, and that the Light Company would, "in *unusual circumstances* sectionalize" their line, if called on to do so; to "sectionalize" means to cut the current off the particular line involved. In other words, "if the Bell Telephone Company knew that there was need at a certain point of having the current turned off," "that might be observed." There is no evidence that it was *necessary* for the line to be sectionalized, or the current to be cut off, in order to properly trim the branches away from the telephone lines. So far as the evidence shows, that work could have been done in safety, provided the third electric wire had been seen and avoided as were the other two. There is no evidence that plaintiff or his son relied on any arrangement whereby the current should be cut off whenever it became necessary. Indeed, they worked knowing the current was on; and the evidence is that plaintiff went along trimming trees while the son followed after, collecting and disposing of the brush. Plaintiff went ahead and alone to the trees to be trimmed and especially to the poplar tree where he was hurt, and if anyone was to inspect the tree for light wires he was the only one to do that. His opportunity and means of inspection, and knowledge of whether it was possible to trim the tree without coming in contact with electric wires, was full and complete, at least as good as any other. [Roberts v. Missouri, etc., Tel. Co., 166 Mo. 370, 384.] True, the case just cited is one of assumption of risk and that is not pleaded in the case at

bar, but, the point here made is that if anyone was to de-
cide whether the tree could or could not be trimmed with-
out interference of the wires, either the son, the inde-
pendent contractor, or plaintiff himself, would be the
persons to decide that; and since the son did not go
ahead to inspect the trees, of course, plaintiff as an ex-
perienced tree trimmer was to do his own inspecting.
The plaintiff's evidence is that no request was made to
have the current turned off at any time, not even after
the plaintiff received the slight shock in the elm tree.

Whether this, of itself, is or is not sufficient justi-
fication for the conclusion that no recovery can be predi-
cated on the second ground of negligence, it leads up
to and bears upon the question of plaintiff's contribu-
tory negligence. On this point plaintiff's evidence shows
clearly that he knew he must inspect for himself and must
avoid all electric wires. It shows furthermore that he
could easily have seen the third wire if he had looked as
he came to it. He came south along Grand Avenue from
the elm tree and must therefore have passed the corner
pole, as it was north of the poplar tree where he got
hurt and only ten or fifteen feet away from it. He ad-
mits if he had noticed the pole he could easily have
seen the wire, and says he wishes he had done so, but
he didn't see the pole as he was trimming trees, not
climbing poles, and was keeping tab on the telephone
lines, following them to do his work. He said that if he
had looked at either pole near the tree he would have
seen all the wires. He also says that the third wire was
only *about a foot* distant from the two wires he saw.
A poplar tree is not a spreading tree or very large in the
circumference of its branches, hence it was not difficult
to look around the tree and examine it from all sides.
If he had done this, instead of merely looking ''right up
in the tree'' as he stood close to its trunk, into the brushy
top, he would have undoubtedly seen the third wire, and
it is difficult to see why he did not see it when he and
Jolly were talking about the wires that he did see, since

the wire he did not see and on which he got hurt was such a slight distance from the others, all three of them being about the same distance apart.   It seems to me that plaintiff has conclusively shown himself to be guilty of contributory negligence.   [Straight v. Western Light, etc., Co., 214 Pac. 397; Hornbuckle v. McCarthy et al., 243 S. W. 327; Roberts v. Missouri, etc., Tel. Co., 166 Mo. 370; Egan v. Trenton, etc., Elec. Co., 233 S. W. 239; Doerr v. St. Louis, etc., Assn., 176 Mo. 547.]   And I vote to reverse the judgment on that ground.

*Arnold, J.,* concurs.   *Bland, J.,* concurs in result. Judgment reversed.