FRED W. KLABER, ADMINISTRATOR OF KATIE JAMISON, DECEASED, RESPONDENT, v. KANSAS CITY, MISSOURI, APPELLANT.*

Kansas City Court of Appeals. February 11, 1929.

*Corpus Juris-Cyc References: Appeal and Error, 3CJ, section 756, p. 854, n. 32; 4CJ, section 2890, p. 918, n. 42; Death, 17CJ, section 167, p. 1304, n. 77; Electricity, 20CJ, section 66, p. 386, n. 49; section 67, p. 390, n. 75; p. 391, n. 78; Evidence, 22CJ, section 27, p. 86, n. 73; Municipal Corporations, 43CJ, section 1891, p. 1130, n. 18; Release, 34Cyc, p. 1087, n. 3; Trial, 38Cyc, p. 1603, n. 59; p. 1671, n. 12.

*Thomas J. Skidmore* and *Hogsett & Boyle* for respondent.

*John T. Barker* and *Wm. H. Allen* for appellant.

BLAND, J.—This is an action for the wrongful death of plaintiff's husband, Benjamin M. Jamison. There was a verdict and judg-

ment in the sum of $4250 in favor of plaintiff and defendant has appealed.

The suit was originally brought against the defendant, Kelly-Dennis Company, a corporation, Builders Roofing Company, a corporation, Kansas City Power and Light Company, a corporation, Harry C. Evans and William E. Evans, copartners doing business as The Evans Electrical Company, and Thomas Kelly and Sons, a corporation. During the pendency of the suit plaintiff compromised her claims against the defendants, other than the city, in the aggregate sum of $4000 and dismissed as to all of such defendants. Benjamin W. Jamison was an employee of the Builders Roofing Company when he received the injuries causing his death.

The facts show that plaintiff's husband on May 4, 1923, was injured by having come in contact with an electrical apparatus on the offset of a roof of what is called the Turkey Creek Sewer Pumping Station in Kansas City, a brick building twenty feet in height. On January 30, 1920, the defendant city entered into a general contract with Thomas Kelly and Sons, a corporation, for the construction of what is known as the Turkey Creek Sewer. This contract included, among other things, the erection of said pumping station with the necessary electrical machinery and appliances therefor to be used in connection with the sewer. Kelly-Dennis Company took over the contract from Thomas Kelly and Sons and sublet the roofing of the building in question to the Builders Roofing Company and the electrical work inside of the building to the Evans Electrical Company. The city made a separate contract with the Evans Electrical Company for the construction of an electric apparatus on the roof of the pumping station, which consisted of lightning arresters and appurtenances thereto.

The electric apparatus upon the roof was made up, in part, of a metal frame work, or tower, about ten feet in height, attached to the roof of the offset to the building. Wires ran to insulators upon and near the top of the tower from a disconnecting pole situated a few feet from the building and owned by the Kansas City Power and Light Company, which company furnished the electricity for the plant. In connection with this pole there was a disconnecting switch which, when turned on, permitted electricity to flow into the plant from the wires of the Power and Light Company. On the west side of the steel tower were four metal boxes superimposed upon two "I" beams. These boxes were the lightning arrester proper. The "I" beams were about twenty-four inches apart and the width of the arrester boxes at the bottom was about eighteen inches. Wires from the tower ran through the lightning arresters and to three bushings through each of which ran a rod; these rods extended through the roof and afforded a means for the current of electricity

to be conducted into the interior of the pumping plant where the pumping machinery was stationed. These bushings were of porce-◆ lain and were bell-shaped, or skirted, each bushing having five skirts or bell-appearing protrusions upon them. The top skirt was about eight inches in diameter and the diameter of the skirts increased by two inches from top to bottom. These bushings were from thirty to forty inches in height and were situated about seven feet from the lightning arrester boxes and somewhat to the east thereof. Between the bushings and the lightning arresters was situated the steel tower, the latter being about four feet from the boxes. The wires from the pole to the frame work were six or seven feet above the roof and were uninsulated to the point where they were attached to the tower. On the top of each of the bushings was a lug to which one of the wires was fastened. These lugs were two and one-half inches in length and three-fourths of an inch in diameter and were uninsulated. The inside of the lightning arrester boxes carried the current coming through the wires but the outside of the boxes was also charged to the same extent as the inside. The wires where they were attached to the boxes were not insulated.

It would appear from the testimony that the only uninsulated portions of the apparatus with which one standing on the roof could come in contact were the lugs on top of the bushings, the lightning arrester boxes and the wire attached to those boxes. 13,200 volts of electricity came through this apparatus and into the power plant when the electric current was turned on. It appears that the gravel roofing of the building and on the offset, was laid before the electric apparatus was installed. However, in placing the apparatus on the roof holes were cut in the tower and gravel roofing of the offset for the three rods and bushings which carried the wires down in the interior of the building, which left a condition on the roof, about the base of each of these bushings, which it was necessary to repair. There is direct evidence that the city and Kelly-Dennis Company requested the Evans Electrical Company to make these repairs and that the electric company refused and that the city called upon Kelly-Dennis Company requesting it to fix the roof. The circumstances show that the Kelly-Dennis Company undertook to see to it as there is direct evidence that before deceased went upon the roof, it called upon the Builders Roofing Company to do the work. There is no direct testimony as to when the city called upon the Kelly-Dennis Company but an inference arises that it was before the latter called upon the roofing company. The evidence shows that after Kelly-Dennis Company had called upon the Builders Roofing Company to do the work, the roofing company, on May 4, 1923, sent deceased, one of its employees, to make the repairs and that deceased, while attempting to do so received an electric shock

and burns from some part of the apparatus on the roof, resulting in his death.

The facts relating to the relationship of the various original parties defendant to the situation at the time deceased received his injuries, are as follows: On March 27, 1923, the city wrote a letter to Kelly-Dennis Company, stating that it had inspected and examined the electric wiring and appliances at the pumping station in question and found the same were in conformity with the specifications and notified that company that it accepted "that portion of the work in its complete state but reserved final acceptance until the work is completed and in operation." This, evidently, had reference to the electrical wiring appliances inside of the building for the reason that the city had a separate contract with the Evans Electrical Company for the apparatus on top of the building. The evidence shows that on March 27, 1923, the city entered into an agreement with the Kansas City Power and Light Company under which that company installed the pole and made the necessary connections from the pole to the apparatus on the roof. On April 16, 1923, the city made a contract with the Light Company for furnishing the electrical power for the operation of the plant. On April 17, 1923, the light company had completed the connections and wrote a letter to the city in which were enclosed certain rules and instructions for the operation of the apparatus. These instructions warned the city that the latter was dealing with 13,200 volts of electricity; that the apparatus on top of the building carried that amount of electricity "whether the pole top switch is closed or not" and "you may get the same shock by touching the iron base of the arrester that you would by touching the 13,200 volt line." The letter instructed the city to "install and maintain suitable 13,200 volt danger signs on the roof and in the sub-station for the protection of life," and not to "permit anyone to work on the roof in the vicinity of the lightning arrester or roof bushings without first having the System Operator of the Kansas City Power and Light Company open the pole top switch and discharge the lightning arrester." It appears that even after the current would be turned off, the lightning arrester would still be charged with a heavy voltage of electricity and require another operation in order to fully discharge it.

On April 23, the city placed a watchman upon the building and detailed Louis Webster, an electrical engineer, and a man by the name of Campbell, both city employees, to run the electric pumps every day in order to break them in. At that time the Evans Electrical Company had completed the work both inside and on top of the building, the current had been turned on and the appliances in the pumping station were placed in operation. The plant was not

operated for the purpose of pumping sewage until after deceased was injured. The pumps were started up and were working daily until after the day deceased was injured. At the time of that unfortunate event, the city had not taken over the building itself or finally accepted the entire work under the contract but had merely taken charge of the electric apparatus in order to operate and break in the pumps. The part not taken over by the city remained in the control of the main contractor, the Kelly-Dennis Company. The city engineer testified that there were "various little odds and ends to be done" and that whatever work of that kind remained, was for the Kelly-Dennis Company to perform.

The Board of Public Works instructed its secretary to direct the watchman at the plant to prevent anyone from going onto the building and about the apparatus unless such person had a permit from the Board. However, the evidence shows that the only instructions given by the secretary to the watchman was to see that no boys came around or broke out the windows or that anyone came and stole material out of the building; that he was given no instructions about the roof or the electrical apparatus and did not know there was any dangerous apparatus on the roof. There was no inclosure or guard of any kind around the apparatus on the roof but the evidence is disputed as to whether there were any warning signs upon the roof, plaintiff's evidence tending to show that there were no such signs on or about any part of the apparatus. It seems that the apparatus was properly insulated. However, expert electricians testified that they would not touch insulated electric wires that carried 13,200 volts of electricity or roof bushings through which ran wires carrying that charge of electricity; that probably they would not be injured by so doing but they would take no chances. It is apparent from the testimony that the apparatus on the top of the building in question was a very dangerous one after the current had been turned on. There was no way of reaching the roof where this apparatus was situated without the use of a ladder. When deceased received a work ticket from the Builders Roofing Company directing him to go upon the roof where the apparatus was situated and make repairs, he, together with his helper, went to the building with spade, broom, felt, pitch, rubber, and a kettle for heating the pitch. The ladder was set up and deceased went on it to the roof, taking a rope with which to pull up the tools. In doing work of this kind a spade was used to scrape the gravel loose from the roof and a broom to sweep and dust the gravel away from the place to be patched. The blade of the spade was twelve inches long and eight inches wide and was of steel; the handle was of wood. In patching around a bushing, the first thing to be done was to scrape the

gravel loose from the space to be patched for a distance of about six inches around the base of the bushing.

After deceased had pulled the broom and spade upon the roof, his helper cut the pitch, put it in the kettle and built a fire to heat it. About five minutes after the broom and spade were pulled upon the roof a man came from around the building and told the helper that someone on the building had been injured. The helper thereupon went upon the roof and found deceased lying unconscious thereon between the tower and the arrester boxes. Another witness testified that deceased was lying touching "or laying inside" the bushing on the side nearest the tower. The spade was against the bottom flanges of the first bushing from the main roof. The helper managed to get deceased upon his feet and dragged him from the apparatus. He took deceased to the main roof and with the broom knocked the spade away. There was a place at the base of this bushing where deceased had evidently started to scrape the gravel away preparatory to making the repairs. The helper testified "it appeared to be a place where he had started to remove the gravel for flashing on that flange." "Flashing" is a part of the work of repairing the roof. Deceased had a burn on his hand above his wrist, on the back of his head, and his neck appeared to be scorched. He was treated by a physician who testified to numerous third degree electrical burns at various places on deceased's body. There were third degree burns on his left foot, on the little, second and third toes with their tendons exposed; the heel of the right foot was practically burned off and the bones and tendons were exposed. As the result of the electrical shock he received deceased developed instital nephritis and ulceration of the intestines and stomach, causing his death on September 3, 1923. Prior to May 4, 1923, deceased was of apparent good health and was a hard working man.

The petition, as before stated, named the various persons and corporations connected with this work as defendants. The negligence alleged in reference to all of the defendants was as follows:

"That although said defendants were in control of said building and electrical apparatus and maintaining and operating the same, and although they knew or by the exercise of ordinry care could have known that from time to time it would be necessary for this plaintiff or other persons to be upon the roof of said building and in the immediate vicinity of said apparatus, and although they knew, or by the exercise of ordinary care could have known of the highly dangerous condition of said apparatus by reason of the high and dangerous voltage of electricity carried by the wires entering and leaving said apparatus they carelessly and negligently failed and neglected to sufficiently insulate and to keep sufficiently insulated said wires and apparatus so as to protect this deceased or other per-

sons, who might be obliged to be in and about the vicinity of said apparatus and carelessly and negligently failed to protect or guard said apparatus so as to pervent such persons from coming in contact therewith and carelessly and negligently failed an neglected to place proper warning signs on and about said apparatus and carelessly and negligently failed and neglected to warn plaintiff of the dangerous condition of said apparatus, and carelessly and negligently failed and neglected to place a watchman in charge of said apparatus to warn deceased or other persons who might be obliged to work in the immediate vicinity thereof.''

In addition to this negligence the petition charged further negligence on the part of the Evans Electrical Company in failing to properly insulate the wires and apparatus in question and as against the Builders Roofing Company in failing to furnish deceased with a reasonably safe place in which to work in that it required deceased to work upon the roof in close proximity to the apparatus, knowing that he would be likely to get hurt and carelessly and negligently failed to warn him and as to the defendant Kansas City Power and Light Company in negligently permitting high and dangerous currents of electricity to run over its wires connecting with said apparatus, when it knew or should have known of the defective condition of the apparatus and knew that electricity would be likely to escape from it and injure persons working in the vicinity of it.

The answer of the city pleaded that plaintiff, having settled her claim for damages against the other defendants and discharged them for liability, ''has fully released this defendant from any cause of action, if any, or claim for damages, if any, which she may have by reason of the facts alleged in her said petition.''

At the request of plaintiff the court gave her instruction No. 1, which reads as follows:

''The court instructs the jury that if you find from the evidence that on May 4, 1923, Benjamin F. Jamison, deceased, was in the employ of the Builders Roofing Company and was directed by said company to go to the pumping station in question to repair the roof around certain pipes which ran through said roof, and if you further find that said work was a part of the work yet to be done by the Kelly-Dennis Company in finishing up under its contract, with Kansas City for the construction of said pumping station, and that the Kelly-Dennis Company had requested the Builders Roofing Company to have said repairs made; and if you further find that the pipes in question were composed of a series of bell-shaped bushings fashioned together to form a conduit through which electric wires were conveyed from the steel structure on said roof through the roof and into the building and that in the work which deceased was required to do on said roof it was necessary for him to work in

close proximity to said bushings and that the electric wires leading from said structure to and through said bushings and into said building were at said time carrying 13,200 volts of electricity, and if you further find that said place on said roof where deceased was so required to work was thereby rendered highly dangerous and unsafe; and if you further find that while the said deceased was engaged in said work in and about said pipes and bushings he came in contact with a current of electricity which escaped from some portion of said structure (if you so find) and as a result thereof said deceased was injured, and if you further find that said injuries directly caused the death of said deceased September 3, 1923, and if you further find that on May 4, 1923, said steel structure and bushings were maintained and controlled by the defendant Kansas City, and were being used by said defendant for the purpose of conducting electrical current into said building for the operation of the pumps in said building, and if you further find that said structure and bushings had been so maintained, controlled and used by said defendant since April 23, 1923, and that on and after April 23, 1923, said defendant knew or by the exercise of ordinary care on its part could have known that from time to time it would be necessary for persons to be on the roof of said building, in the immediate vicinity of said structure and bushings, and knew or by the exercise of ordinary care could have known that said place on said roof was highly dangerous and unsafe for such persons by reason of the high current of electricity carried by the wires leading to and from said structure, if you so find, and if you further find said defendant carelessly and negligently failed to protect or guard said structure so as to prevent such persons from coming in contact with the uninsulated portions, if any, thereof, and carelessly and negligently failed to place proper warning signs on and about said structure reasonably sufficient to warn such persons of the danger thereof, and if you further find that the injuries to deceased were directly caused by the carelessness and negligence of said defendant in the respects above set forth (if you find said defendant was negligent in said respects) and if you further find that said deceased was at all times in the exercise of ordinary care for his own safety and that plaintiff was the wife and is now the widow of said deceased, and that plaintiff has been damaged by the death of said deceased in excess of any amounts which you believe and find from the evidence have heretofore been paid by other defendants in this cause to said plaintiff, then under the law your verdict must be in favor of the plaintiff and against said defendant Kansas City, and you will assess plaintiff's damages at such sum (not to exceed $10,000) as you believe and find from the evidence will be fair, reasonable and just compensation to her for the death of her said husband and give

the defendant credit on said sum for all amounts which you believe and find from the evidence have been paid to the plaintiff by the other defendants in this cause, and the balance remaining, if any, you will return as your verdict in this case, your verdict in all, however, not to exceed the sum of $6000.''

The first point made by the defendant is that the court erred in refusing to give its instruction in the nature of a demurrer to the evidence for the reason that plaintiff's settlement with the co-defendants and dismissal of her suit as to them, was a bar to any recovery she might have had against the defendant, city. In support of this contention, the city cites section 8949, Revised Statutes 1919, which gives the city a right to compel the joining with it as co-defendants of any person or persons jointly liable with it to plaintiff. It has been held that where the plaintiff has joined such person or persons in the first instance, it is unnecessary for the city to take any action to that end contemplated by the statute. [Funk v. Kansas City, 208 S. W. 840, 844.] It is insisted by the defendant that the only liability charged in the petition against it, is for "allowing the so-called dangerous condition to remain;" that this condition was brought about by the acts of the Evans Electrical Company and the Kansas City Power and Light Company; that these companies, together with the Kelly-Dennis Company and the Builders Roofing Company, by reason of the peculiar relationship of the two latter companies to the work that was going on, were primarily liable for the death of deceased and that defendant city was secondarily liable. It seems to be admitted that the statute in question refers only to such persons being made parties defendant who are *primarily* liable for the injury to a plaintiff. [See, also, Kansas City v. Mullins, 200 Mo. App. 639, 642.] It has been held to the effect that a settlement of the kind involved in this case discharges the city if as a matter of fact any cause of action existed at the time of the settlement against any of the other defendants primarily liable. [See Funk v. Kansas City, supra, l. c. 844; Shippey v. Kansas City, 254 Mo. 1.]

There is no question but that one injured by the negligence of another or others has a perfect right, under the provisions of section 4223, Revised Statutes 1919, to release one or more of the joint tortfeasors and that such release does not as a matter of law release the others when the release is not in full of his entire cause of action. [See Knoles v. Southwestern Bell Telephone Company, 265 S. W. 1005.] But where the city is such a tortfeasor, the rule may or may not apply according to the circumstances and the construction to be given. [Section 8949, R. S. 1919.] The last-mentioned statute was enacted for the benefit of the city but does not purport to affect the substantial rights of plaintiff in a case but is for the purpose of preventing circuity of action by permitting

the city to have the primary liability of its joint tortfeasor to be established in the first or main case. [Hutchison v. Mullins, 189 Mo. App. 438, 446, 449.] To hold that this statute penalizes a plaintiff, if she exercise her right to settle her lawsuit as against the co-defendants of the city, would be to deny a plaintiff of a very substantial right, for which we find no authority in the law. However, it is unnecessary for us in this case to question the propriety of the holding in the Funk and Shippey cases. For in these cases it is held in effect that if no cause of action exists against the co-defendants of the city, then the release of the co-defendants does not release the city; which we take to mean that if the co-defendants with the city are not *primarily* liable, then the city is not released.

There is nothing in the petition in the case at bar disclosing upon its face any primary liability upon the part of any of the city's co-defendants. The case is pleaded as though all of the defendants were liable for the negligence committed by them without rank as to their liability. The separate allegation as against the Evans Electrical Company that it failed to insulate the wires and apparatus and that the city maintained and operated the same in its uninsulated condition, does not disclose primary liability on the part of the Evans Electrical Company. If a property owner negligently constructs and maintains a cellar door in the sidewalk and the city has timely notice, either express or constructive, of the condition, and someone is hurt by reason of the negligence of the property owner, the property owner is primarily liable and the city secondarily. If one negligently places an obstruction upon a sidewalk, resulting in a pedestrian being injured and the city had notice, actual or implied, of the obstruction in time to have removed the same and failed to do so before the pedestrian was injured, the primary liability would be upon the person so placing the obstruction. In the first case, should the city take over the property and maintain the doors of the cellarway in their negligent condition and thereafter the pedestrian were hurt, there would be no question of primary and secondary liability, the city would be liable without regard to the liability of anyone else. In the second case, if the city, after the obstruction was placed upon the sidewalk, assumed control, dominion and operation of it, such as it did of the apparatus in the case at bar, then the city would be liable without regard to the liability of any other person. The same condition obtains as to the allegation in the petition with specific reference to the Kansas City Power and Light Company and the Builders Roofing Company. The allegation in the petition in reference to the Builders Roofing Company was in failing to furnish deceased a reasonably safe place in which to work. This together with the other facts would not make the roofing company primarily and the city secondarily liable. [Roy

v. Kansas City, 204 Mo. App. 332, 349.] So we find upon an examination of the petition that there is nothing disclosed therein necessarily showing any primary liability upon the part of anybody.

From what we have said it follows that if there was no primary liability, under section 8949, Revised Statutes 1919, on the part of the co-defendants, plaintiff would have a perfect right to settle with the co-defendants without affecting her right to proceed against the city, and that section 8949, Revised Statutes 1919, has no application. We think, therefore, that under the circumstances present in this case, it was the duty of the city to plead facts showing that its co-defendants were released under circumstances that would release it, that is, that its co-defendants, or at least one of them, were primarily liable for the death of deceased. This the answer fails to do and therefore states no defense on this ground.

Aside from this, at the instance of the defendant, the court in two instructions told the jury that if there was any negligence on the part of any other person or corporation causing the injuries that deceased received, their verdict should be in favor of the city. These instructions were more favorable to the defendant than it was entitled to have. While it may be that the settlement with the co-defendants of the city estopped plaintiff from asserting that there was no liability on the part of such co-defendants (Abbott v. City of Senath, 243 S. W. 641, 642), there was no admission by such an act on her part of any *primary* liability on the part of said defendants.

It is insisted that the court erred in overruling the demurrer to the evidence for the reason, as defendant claims, there is no proof of any negligence on the part of the city. While the evidence may show, as defendant contends, that the installation and insulation of the structure on top of the building was of the highest type of material and workmanship, yet plaintiff did not recover upon the negligent installation or improper design or insulation of the apparatus but recovered upon the theory that the city knew or could have known that it would be necessary for a person, such as deceased, to be upon the roof and in the vicinity of the apparatus, and that the situation there was dangerous (and the evidence so shows regardless as to the type of its insulation and installation) and failed to protect or guard the apparatus, and failed to place proper warning signs about the same. There was ample evidence tending to support the charge of negligence submitted to the jury. In connection with this point the weight of the evidence relative to the existence of warning signs about the structure, is discussed by defendant. Of course, the weight of the evidence was for the jury, and there was ample testimony tending to show that there was no warning sign

about or anything else to warn deceased of the dangerous quantity of electricity present.

It is insisted that the court erred in failing to sustain defendant's demurrer to the evidence because there is nothing to show that deceased received injuries, if any, as the result of defendant's negligence; that the manner in which it is claimed he received his alleged injuries must be arrived at by building inference upon inference or presumption upon presumption. The evidence in this case, although mostly circumstantial, is very strong in its tendency to show what happened to deceased after he went upon the building. From the evidence it can be fairly inferred that he was scraping away gravel preparatory to repairing the roof around one of the bushings at the time something happened to him causing him to fall in an unconscious condition. It is argued that there is no evidence that he received an electrical shock at the time and in this connection defendant points out that there was no testimony that there were no burns on his person prior to that time. However, the evidence showed that the situation on the roof was made dangerous by the presence of a high voltage of electricity; that deceased was a man in good health prior to his going upon the building; that, thereafter, he received some injury which caused him to become unconscious and fall to the roof; that burns were immediately found upon his person; that these burns were shown to be electric burns; that he was suffering from electrical burns and electric shocks and the effects thereof; that he gradually grew worse until his death, which was caused as the result of electricity being applied to his body. Defendant does not suggest anything that might possibly have happened to deceased at the time in question to cause him to be rendered unconscious and to go down hill to his death, and it is apparent to us that he came into contact with something bearing a high charge of electricity. While scraping the gravel he was required to be very near the lug on top of the bushing, which the evidence shows was two and one-half inches in height, uninsulated and carried 13,200 volts of electricity. Aside from this, the evidence shows that it was dangerous to touch any part of this apparatus. We are at a loss to understand how the jury could have arrived at any other conclusion than that deceased received a severe electrical shock while on the roof of the building in question, and that this shock came from some part of the apparatus about which he was required to work.

From what we have said there is no merit in the contention that there is no evidence that the injury deceased received upon the roof was the sole and proximate cause of his death four months later. There was no necessity for the jury to build inference upon inference or presumption upon presumption to arrive at the con-

clusions we have indicated. We have examined the case of State ex rel. v. Cox, 298 Mo. 427, and the other cases cited by the defendant on this question and find them not in point. The fact that deceased's helper and possibly another man went upon the roof and dragged deceased's body from the apparatus without themselves receiving an electrical shock, is not conclusive evidence that there was no electricity present with which one could come in contact.

We think there is no question but that the negligence of the city was thoroughly established. Although the city had not finally taken over the work from Kelly-Dennis Company, it was in the control and operation of the electrical apparatus both inside of the building and upon the roof. It appears that the city made a separate contract with the Evans Electrical Company in reference to the installation of the apparatus on the roof, an inference therefore arises. as to this part of the electrical system with which the general contractor had nothing to do, that the exclusive control of this was in the hands of the city. The testimony was that it was about the 23rd day of April, 1923, before the Evans Electrical Company could get from the city final inspection and acceptance of it (the roof apparatus). It appears that there was still work to be done upon the roof in that the cuts made therein by the installation of the apparatus thereon had to be mended. The building itself had not been entirely turned over to the city. However, we take it that the city had control of the electric apparatus including the lightning arrester boxes, the tower and the lugs. This apparatus had been completely installed and turned over to the city and the electricity turned on. The city also knew, as its engineer testified, that there were "various little odds and ends to be done" that were around the building. It also knew when it requested the Kelly-Dennis Company to repair the roof where the bushings had been erected that someone would be required to go there for that purpose, yet it did not place any warning signs on the apparatus or warning fense around it or cause the electricity to be disconnected therefrom and the current discharged, but having every reason to believe that some workman would be sent there to repair the roof, took no precaution whatever to guard against his receiving a deadly charge of electricity. Having control of this highly dangerous agency, it failed to discharge that high degree of care that the law requires of such person. [Godfrey v. Kansas City Power & Light Company, 253 S. W. 233, 236; Hohimer v. City Light & Traction Company, 262 S. W. 403. 408.] The fact that the city was not engaged in the business of conveying electricity commercially from place to place over public thoroughfares, would not make any difference in the application of this rule of high degree of care.

It is next insisted that the court erred in refusing to sustain defendant's demurrer to the evidence for the reason it is claimed a municipality acts in a ministerial capacity as distinguished from a governmental one in the construction of sewers and that, therefore, the city in this case is not liable for its negligence in failing to properly maintain the electrical appliances in question. We think there is no merit in this contention. [Woods v. Kansas City, 58 Mo. App. 272, 8-9; Thurston v. City of St. Joseph, 51 Mo. 510, 519; Donahue v. Kansas City, 136 Mo. 657; 14 C. J. 1127, 1130, 1131.] Defendant would have us distinguish between damages caused by reason of defective or obstructed sewer and damages resulting from the negligence of the city in the operation or in the preparation for operation of a sewer. We find no such distinction.

Complaint is made of the giving of plaintiff's instruction No. 1. It is claimed this instruction is fatally defective for the following reasons:

"(a) It assumes that some work was necessary and deceased in the performance of that work was required to work on said roof in close proximity to said bushings and electric wires; (b) it assumes that the electric wires leading from said structure to and through said bushings and into said building were at the time carrying 13,200 volts of electricity; (c) it assumes that deceased was engaged in some work in and about some pipes; (d) it assumes that if he did come in contact with a current of electricity, that he was engaged at that instant in some work which was necessary to be done and which he was required to do; (e) it assumes that the current of electricity escaped from some portion of said structure; (f) it assumes that it was necessary for persons to be on the roof of said building and in the immediate vicinity of said bushings and structure; (g) it assumes that said place on said roof was highly dangerous; (h) it assumes that this structure was dangerous; (i) it authorizes the jury to find that he was at all times in the exercise of ordinary care for his own safety and there is no evidence to support such finding; (j) it is indefinite, confusing and misleading to the jury in that it authorizes the jury to convict defendant of negligence 'in the respect set forth above;' (k) it is ambiguous, contradictory and conflicting in its direction on the measure of damages; (l) it assumes that a pecuniary loss was suffered by plaintiff."

It will be seen from an examination of the following cases that these contentions are without merit: Warneke v. Rope Company, 186 Mo. App. 30; Costello v. Kansas City, 219 S. W. 389, 391; Geary v. Railway Company, 138 Mo. 251, 259, 260; Damman v. St. Louis, 152 Mo. 186, 198; Brady v. Railroad, 206 Mo. 509, 538; State v. Grayor, 89 Mo. 600, 605, 606. We find most of the objections to

this instruction to be so wholly without merit that we feel that we would not be justified in further prolonging the opinion by going into a detailed discussion of them. However, we will discuss some of the contentions made, which to our mind might appear at first blush to have some possible substance to them.

We think there is no dispute in the testimony but that deceased was properly on the roof for the purpose of repairing it. The instruction does not assume that it was necessary for deceased to work in close proximity to the bushings as is claimed by the defendant. There is no merit in the contention that it was improper to submit that deceased was in the exercise of ordinary care for the reason, as defendant claims, there was no evidence to support such a finding. Plaintiff is entitled to the presumption of ordinary care on the part of deceased.

We fail to see how the jury could have been mislead by the use of the words in the instruction "in the respect above set forth." These words clearly refer to the negligent acts of the defendant hypothesized in that part of the instruction going before the words used. The instruction does not assume that plaintiff suffered a pecuniary loss but submits the question as to whether or not plaintiff was injured. While the words "pecuniary loss" are not contained in the instruction, if defendant thought the language of the instruction too broad in this respect it should have offered a limiting instruction. [Powell v. Railroad, 255 Mo. 420.]

Complaint is made that the instruction told the jury they might return a verdict for any amount not to exceed $10,000, thus emphasizing the maximum amount that can be recovered in a death action, when no such verdict should have been returned in this case. We think that this criticism leveled at the instruction is without merit. It was necessary that the instruction mention the maximum amount of $10,000 for the reason there had been a settlement of part of plaintiff's cause of action for $4000 and it would have been improper for the jury to have been instructed that they should return a verdict in favor of plaintiff not to exceed $6000. If plaintiff's total damages were only $6000, she would not be entitled to recover the full amount of that sum from defendant as she had received $4000 from its co-defendant. It is not pointed out how this situation could have been presented to the jury in any better way than that submitted in the instruction. At any rate we fail to see any error in connection with the matter. It is claimed that this was a peremptory instruction to find for plaintiff but we do not so find. Although there were no other defendants in the case we cannot see how the jury could be misled by the use in the instruction of the words "other *defendants* in this cause."

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.