ANN H. SNOW, Widow, THOMAS EDWARD SNOW and HEATHER DEEANNE
SNOW, minor children of DAVID R. SNOW, Deceased Employee, Plain-
tiffs v. DICK & KIRKMAN, INC., Employer; BITUMINOUS CASUALTY
INSURANCE CO., Carrier, Defendants

No. 8410IC160

(Filed 16 April 1985)

Master and Servant § 56— workers' compensation—electric shock as cause of
death—sufficient evidence

The Industrial Commission's finding that an electrician's death was caused
by an electrical shock accidentally sustained in his employment was supported
by evidence tending to show that decedent was twenty-nine years old and in
good health and physical condition; decedent was sitting on a wire spool and
working on an electrical control panel with a screwdriver when he suddenly
fell over in a cramped, clinched position; after falling, decedent had an erratic,
disorganized heartbeat and died without uttering a word; and one doctor was
of the opinion that electric shock rather than sudden heart failure was the
more likely cause of death. Evidence that decedent's coronary arteries were
mildly hardened, that the left ventricular area of his heart was mildly en-
larged, and that a second doctor thought sudden, spontaneous heart failure
was the more likely cause of death merely presented a question for the In-
dustrial Commission as to the cause of death.

APPEAL by defendants from opinion and award of the North
Carolina Industrial Commission entered 20 December 1983. Heard
in the Court of Appeals 26 October 1984.

On 28 April 1981, while working for defendant Dick &
Kirkman, Inc., an electrical contractor, David R. Snow, a twenty-
nine year old electrician, fell over dead. The claim of his widow
and minor children for Workers' Compensation benefits, after be-
ing heard by a Deputy Commissioner of the North Carolina Indus-
trial Commission, was approved. Upon defendants appealing to
the Full Commission the opinion and award of the Deputy Com-
missioner was affirmed in all respects and defendants then ap-
pealed to this Court. The opinion and award appealed from is
based on a finding of fact that Snow's death resulted from an elec-
trical shock accidentally received during the course of his work,
which caused his heart to beat in an erratic, unrhythmical, disor-
ganized way, known as a ventricular fibrillation, and then stop.
The evidence relating to this central and controlling finding, when
favorably viewed for the plaintiffs, was to the following effect:

Defendant employer was doing the electrical work on a factory building that was being constructed in Durham County for SCM/Glidden Metals. The project was nearing completion, virtually all the wiring had been done, the production machinery had been installed, and the electrical equipment and facilities were being checked and made ready for productive use. On the morning involved Snow was working on a cabinet-sized Sunbeam control panel that supplied electricity to a furnace and conveyor system. Four wires, which were not then energized, stuck out from the front of the panel and Snow was instructed to put insulating nuts on their ends. The panel had about a hundred screw-type terminals altogether, some of which were energized with 277 volts of electricity as wires from them went to machines that were then being test operated by Kline Proud, a Sunbeam Equipment Corporation field service representative and Tom Murphy, the factory owner's engineer. Snow was seated on a wire reel spool in front of the panel, William Terry, a co-worker, was working at the panel next to him, and they were talking to each other as they worked. Terry's view was obstructed and in order to see Snow he had to lean back. Proud and Murphy, the only other people in the room, were not looking at Snow at this time. Terry was talking and when Snow did not respond Terry leaned back and saw Snow on the cement floor in front of the panel; his jaw was clinched tightly and his right leg was drawing up as though he had a cramp. His jaws were clinched so tightly they had to be forcibly pried apart before mouth-to-mouth resuscitation could be administered.

No one had seen what Snow was doing immediately before he fell and no one had heard any popping noises or seen a flash of sparks. No burn marks were found on his tools or on his body. Following Snow's collapse the four wires he had been directed to put insulating nuts on had such nuts on them; and the last tool seen in Snow's hands by anyone on the scene was a screwdriver, which is not used in putting insulating nuts on wires. Archie Emory, Snow's foreman, and Doug Overcash, a professional electrician who had worked with Snow for several years before this incident, both testified that it is normal procedure to make sure that wires are labeled and that screws are tight before closing a panel and that Snow, a good worker with initiative, customarily and habitually went on to the next task required after completing

the one assigned. Overcash also testified that in operating and testing electrical equipment he had been shocked many times, a few times seriously, without ever being burned, and that on one occasion, although a charge of 277 volts knocked him off a ladder and caused heart palpitations which rendered him immobile and incapable of speech for some fifteen minutes it did not burn him. Dr. Yancey Mebane noted that low-voltage shocks from 110 to 440 volts most commonly do not leave burns.

As to Snow's health, condition, activities and living habits, the evidence was that: He had worked regularly for years but had done no strenuous work that morning. His personal physician, Dr. Walter C. Mahaffee, described his physical condition as "excellent," and a fellow worker said that he was in good physical condition and "never got tired." But an electrocardiogram of Snow's heart about six months earlier was "abnormal," and the autopsy done on his body revealed that his heart was mildly enlarged in the left ventricular area and showed "miscroscopically some foci of scarring." A cardiologist consulted by the autopsy pathologist, though expressing the opinion that the probable cause of death was heart disease, testified that such scarring of the heart as was found in Snow's heart was "fairly mild" compared to the sort of things that are commonly found in the hearts of people who die from heart trouble. Dr. Mahaffee, who had been Snow's family doctor for ten years, testified that Snow's blood pressure was on the low side of normal, he did not have diabetes, was a non-smoker, and that he took the electrocardiogram because Snow reported having pain in the lower chest and abdomen for the preceding five weeks, and the electrocardiogram, in his opinion, showed no significant heart condition. He also testified that Snow's ailment was diagnosed as being a gastric disturbance and treated as such with favorable results almost immediately. The Rescue Squad members who took Snow to the hospital noted that his heart was undergoing ventricular fibrillation, which condition continued until death came shortly after he was taken to the Durham County Hospital. The death certificate by the autopsy pathologist attributed Snow's death to cardiac arrest caused by disorganized, unrhythmical contractions of the heart muscles, the cause of which was deemed to be unknown; but it was thought significant, according to the report, that "the investigation of the scene of death does not indicate that he was in contact

with electrical current." Dr. Mebane, plaintiffs' expert medical witness, attached little significance to the electrocardiogram because, in his opinion, the condition it indicated was mild and could be due to the pain that Snow was then having or to the leads being improperly affixed on his body by the technician. In his view abnormal laboratory tests to have value must be repeated in order to minimize the possibility of such mistakes and verify the indications; but he agreed that the electrocardiogram indicating mild arteriosclerosis was compatible with the autopsy findings. Both in response to a hypothetical question and also in response to various other questions put to him by plaintiffs' lawyers, Dr. Mebane also testified in substance that: It was much more likely that the disorganized, unrhythmical contractions of Snow's heart muscles, which resulted in death, were caused by an electrical shock than a diseased heart. His reasons for this opinion included the absence of diabetes, high blood pressure, and of any signs or symptoms of illness immediately preceding his collapse; Snow's youth, vigor, and good living and working habits; and the wire reel spool that Snow was sitting on and the relatively new concrete floor his feet were on, both of which, in his opinion, enhanced the chances of an electrical shock occurring upon any contact with an energized part of the panel.

*Douglas S. Harris for plaintiff appellees.*

*Horton and Michaels, by John A. Michaels, for defendant appellants.*

PHILLIPS, Judge.

The crucial and determinative question raised by this appeal is whether the Commission's finding that decedent's death was precipitated by an electrical shock accidentally sustained in his employment is supported by competent evidence. Defendants' several other assignments of error raise questions that are either subordinate or immaterial to this one, and will be addressed only as the disposition of this question requires. The competent evidence before the Commission was sufficient to support the finding made in our opinion, and we affirm the opinion and award appealed from. The credibility and weight of the evidence was for the Commission to determine and the Commission's findings, if supported by competent evidence, are conclusive. *Watson v. Clay*

*Co.*, 242 N.C. 763, 89 S.E. 2d 465 (1955). That other findings could have been properly made from the evidence is irrelevant. *Fields v. Tompkins-Johnston Plumbing Co.*, 224 N.C. 841, 32 S.E. 2d 623 (1945). Nor did accident and effect have to be established by eye witnesses or to a mathematical or scientific certainty, as is implicit in defendants' arguments. Inferences from circumstances when reasonably drawn are permissible and that other reasonable inferences could have been drawn is no indication of error; deciding which permissible inference to draw from evidentiary circumstances is as much within the fact finder's province as is deciding which of two contradictory witnesses to believe. *Blalock v. City of Durham*, 244 N.C. 208, 92 S.E. 2d 758 (1956). In this instance the inferences as to accident and effect that the Commission drew from the wealth of competent evidence presented were both factually reasonable and legally permissible in our opinion.

The evidence shows that a young man—with a statutory life expectancy of approximately forty-three years, in vigorous health with no sign or symptom of illness, in a place that contained no hazard whatever except electricity, and definitely did contain that in the uncompleted control panel in which he was working with a screwdriver in his hand and before which he was sitting on a wire reel spool—suddenly fell over in a cramped, clinched position, with a wildly disorganized and erratic heartbeat and died without ever uttering a sound or a word, which, in one doctor's opinion, is not characteristic of heart failure. The only medical certainties of any possible significance that evolved from an autopsy of his body were that all of his vital organs were in normal condition except that the coronary arteries were mildly hardened or arteriosclerotic, the left ventricular area of the heart was mildly enlarged and contained some "foci of scarring," and that death resulted from his heart stopping to beat. The autopsy pathologist and the two qualified, experienced medical doctors who testified as to the cause of death unanimously agreed that what caused the heart to cease beating was almost certainly the disorganized, erratic way that it reportedly was beating immediately before death ensued. The two doctors who testified as to the cause of death also agreed that under the evidence recorded the disorganized, erratic heartbeat was caused by one of only two things—sudden heart failure or an electrical shock. Thus, that an electrical shock *could* have been the cause of the disorganized, erratic heartbeat which

---

Snow v. Dick & Kirkman

---

resulted in death was competently testified to by both doctors; their disagreement was only as to whether electric shock or sudden heart failure was the more likely cause. One doctor was of the firm and positive opinion that the chances of Snow having died from an electrical shock "are far greater than the chances of sudden death due to fairly minimal coronary arteriosclerosis he had." Both the Deputy Commissioner who presided at the hearing and the members of the Full Commission who heard the appeal decided that this testimony was more credible than that of the medical expert who was of the opinion that 'sudden, spontaneous heart failure was the more likely cause of the disorganized heartbeat and Snow's ensuing death. That was their province and we cannot say that it was error to do so.

That no one saw any flash or heard any popping sound or that no burn marks were on Snow's body or tools is neither surprising nor decisive in our view. As is commonly known, electricity is usually invisible, and it was testified to that electricity of the relatively low voltage involved here often works silently and leaves no telltale clues behind. Furthermore, just before Snow was stricken, Sunbeam's field representative, Kline Proud, after telling him he was going to energize a part of the panel so that he could check the furnace's loading table about 15 steps away, reached inside the panel and flipped a breaker switch, and before Proud walked halfway to the furnace loading table Snow was stricken, and very shortly thereafter, in recognition of the hazard known to exist, Proud and Glidden's engineer, Murphy, closed the doors to the control panel. To reverse the Commission's decision on this point, we would have to be of the opinion that the only inference that the Commission could reasonably draw from this and the other evidence presented was that at that particular time and in that evidentiary setting Snow's heart suddenly and spontaneously failed, thereby causing his heart to beat in a disorganized way until it stopped. We hold no such opinion.

Affirmed.

Judges WHICHARD and JOHNSON concur.