**Janet PARKER, et al., Respondents,**

v.

**SPRINGFIELD RAILWAY SERVICES/ANHEUSER–BUSCH, INC., et al., Appellants.**

No. 19538.

Missouri Court of Appeals,
Southern District,
Division One.

March 15, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 7, 1995.

Application to Transfer Denied
May 30, 1995.

**104**

Raymond E. Whiteaker, Woolsey, Fisher, Whiteaker & McDonald, Springfield, Edward M. Vokoun, Evans & Dixon, St. Louis, for appellants.

Douglas W. Greene, Clifton M. Smart III, Jeffrey W. Bates, Strong & Associates, P.C., Springfield, for respondents.

PER CURIAM.

James Parker was employed as a welder by Springfield Railway Services. On August 28, 1991 he collapsed at work and died either before or shortly after reaching the Lester Cox Medical Center. His widow and children sought compensation for his death, asserting that he was electrocuted while working. The employer argues that the evidence does not support the finding of accidental death, suggesting that Parker suffered a heart attack. The Administrative Law Judge ruled in favor of the claimants, awarding compensation and also a 15% penalty pursuant to § 287.120(4), RSMo Supp.1993, for violation of § 292.020, RSMo 1986, requiring guarding of dangerous industrial machinery and equipment, or warning of the dangers when guarding is not possible. The Labor and Industrial Relations Commission adopted the recommendation of the Administrative Law Judge and issued an award accordingly. The employer appeals, contending that the award of compensation "is based on speculation and conjecture, is not supported by substantial and competent evidence, is contrary to the overwhelming weight of the evidence, and is contrary to law." It makes the same contentions as to the 15% penalty. We sustain the award of the commission.

■ We find the employer's 41–page statement of facts less than helpful because it includes, in addition to the evidence supportive of the award, conflicting evidence which the commission did not have to and did not accept. The statement is, in effect, a digest of the record, and this is not what is contemplated by Rule 84.04(c). Our reviewing authority is defined by § 287.495.1, RSMo 1986. Resolution of conflicting evidence is for the commission, not for the courts. All evidence and inferences to be drawn from evidence are viewed in the light most favorable to the award. *Smart v. Chrysler Motors Corp.*, 851 S.W.2d 62, 64 (Mo.App.1993). If the facts found by the commission are supported by competent and substantial evidence the court will disregard contrary evidence. We review the record in accordance with these precepts and state the facts which the commission might have found in support of the award.

■ On August 28, 1991, Parker went to work about 5:30 a.m. He wanted to start work early and work through the noon hour so that he could leave early. About 7 a.m. Jeffrey Bilyeu, another welder, joined him. They were applying a "chalk track" in railroad cars used to transport automobiles.

Their equipment consisted of a power supply known as a "welder" or "welding machine" plugged into a wall outlet, a wire feeder, cables to carry the wire, and a "stinger" with a trigger. When the welder is plugged into a power source and the start-up button on the welder is pushed electric power is available to the entire unit. When the trigger is pulled wire comes off a drum on the wire feeder, through cables, and out through the stinger. The wire is energized and, when it hits the metal of a car that is grounded, it becomes hot and melts so as to serve the same purpose as a welding rod. It is sometimes necessary to adjust the tension on the rollers the wire feeds through coming off the drum, and this may be accomplished by turning bolts on top of the pulleys. The operator could then check the tension by pressing the trigger on the stinger, which would cause energized wire to exude, or by pressing a "jog switch" on the wire feeder, which would push unenergized wire through the cables. Most of the operators apparently press the trigger to check tension, rather than using the jog switch.

Parker and Bilyeu finished working on one car about 11:30 a.m. and moved their equipment to the next car they were to work on. Bilyeu saw Parker plugging his power supply to a wall outlet, but did not see him pressing the start-up button. Bilyeu then began his luncheon break. At that time he saw Parker's wire feeder and cables on top of the welder. It was Bilyeu's practice, and that of the other welders, to push the start button after plugging the welder into the wall plug and to leave the unit turned on so long as work continued at a particular location. If the unit has been unplugged from the wall outlet and is then plugged in again the start-up button must be pushed to turn the welder on, even though it was on when the plug was pulled.

Parker chose to work through the lunch hour. About noon he went to the tool room to wipe his glasses and to drink Gatorade furnished by the employer. There he visited with Larry Winder, a custodian who was an experienced welder. The temperature was 86 degrees Fahrenheit at noon. Parker left the tool room and said that he was going back to work. Winder, so far as the record shows, was the first to reach Parker after he was stricken and the last to speak to him while he was alive. The employer seems to argue that Winder's testimony must be taken as true. The Administrative Law Judge stated, however, that "[i]t is not unreasonable to afford precious little weight to the testimony of Mr. Winder and his characterization of events, . . . ."

Winder testified that, from the tool room, he could observe Parker working in a car some 40 to 50 feet away. We give no attention to his variant earlier statements. Parker walked through the car with an apparently normal gait but had to stoop because of the low clearance. He was wearing his gloves. Winder had work to do in the tool room and did not observe Parker continuously. He next saw him kneeling and then saw him roll over on his back. Winder immediately went to see if he needed help. Parker pointed to his chest and stomach but made no audible response. Winder then ran to the superintendent's office to summon aid, returning to the car before anybody else arrived. Winder turned the power off, later giving conflicting accounts as to how he accomplished this. He looked at his watch which showed 12:30 p.m. Parker did not have his gloves on and was not wearing his welding hood. He was lying on top of the cables which carried the wire from the feeder and through the stinger. His insulated wire cutting pliers were on the floor beside him. The pliers would be used to cut excess wire after adjusting the tension. Different witnesses placed the stinger under Parker, or from three to ten feet from his body.

In testimony which the employer regards as crucial Winder testified that he first undertook to turn the welder off by pressing the stop button, which is on its right side below, and independent of, the start-up button. He felt and heard no vibration and concluded that the unit was not energized when he pressed the stop button. If the unit were not energized, then Parker could not have been electrocuted. The Administrative Law Judge pointed out that Winder at various times had said that he cut the power off by pressing the stop button, which would

have been unnecessary if the unit were not turned on, that he had disconnected the plug from the wall outlet, and that he had flipped the circuit breaker switch on the box near the wall outlet.

A photograph showed that Parker had taken steps to prepare for welding at the site. He had cut a notch out of the track and the next step would be to begin welding, although there was no indication that he had done any welding before he collapsed. Wire was seen protruding from the stinger and this evidence, together with Bilyeu's testimony as to the custom of the welders, persuaded the judge that the equipment was energized. It could be inferred that Parker had prepared to weld, which would require that the machine be turned on, and then found problems with the tension, which he undertook to adjust, removing his gloves and going to his knees. The commission might have considered it unusual that he would not have turned on the unit by this time, and could properly infer that the machine was energized when he collapsed.

The employer also makes much of Winder's testimony as to the location of the stinger and other items of equipment after Parker had collapsed. The Administrative Law Judge observed that conflicting accounts had been presented and concluded that "it would not be unreasonable to assume the wire feeder handle held by the decedent could come to rest two to eight feet from the corpse, . . . ." Quite a few people had come to the scene and the judge said that it was difficult to determine "what was moved and by whom." It is also plausible that Parker, when he felt the shock, voluntarily or involuntarily cast the stinger away.

Several welders testified that they had felt shocks while operating the welding equipment. The employer observes that none of these shocks was fatal, or even severe, but there was testimony that electricity operates in unpredictable ways. Perspiration, which is inevitable on a hot day in Springfield for those wearing heavy clothes, might enhance the potential for severe shock, as would removing one's gloves. Insulation on the cables lying under Parker's body was frayed in several places so as to expose the bare copper wire.

Parker was taken by ambulance to Lester Cox Medical Center, where efforts at resuscitation were totally unsuccessful. The county medical examiner designated Dr. James Spindler, a board-certified pathologist, to perform an autopsy. The autopsy room at the hospital was in use and Dr. Spindler did an external examination, intending to perform the autopsy on the following day. He noted a burn on the palm surface of the right hand at the base of the fingers and expressed the strong opinion that it was an electrical burn rather than a blister or thermal burn. He showed the burn to Dr. Haake, another pathologist, as a classic example of an electrical burn. Dr. Haake agreed with Dr. Spindler's classification of the burn. Dr. Spindler expressed the firm conclusion that Parker's death was caused by electrocution. He said that in cases of electrocution there would not necessarily be an exit wound. The commission could have disregarded other expert testimony argued at length by the employer. Several witnesses, including Mrs. Parker, testified that they had seen no indication of any kind of burn on the decedent's right hand prior to his collapse. Thus the commission did not have to accept testimony, lay or expert, indicating that the burn had been sustained several days earlier, or that it did not have the characteristics of an electrical burn.

The autopsy was not performed because the county medical examiner, persuaded that there was no foul play, would not authorize payment by the county. Dr. Spindler said that the autopsy would not necessarily yield additional evidence to confirm death by electrocution, but might rule out other causes such as coronary artery disease. The commission could accept his testimony as to the cause of death. Autopsy is not a requirement when the expert considers other available information sufficient.

■ Courts regularly hold that electrocution as a cause of death or injury may be established by circumstantial evidence. *Ballinger v. Gascosage Electric Co-op*, 788 S.W.2d 506, 509 (Mo. banc 1990), speaks of the "powerful, speedy and capricious forces

of electricity." Several reported cases have sustained findings of accidental electrocution when the evidence shows a power source and symptoms consistent with death by electrocution. *Jamison v. Kansas City*, 223 Mo.App. 684, 17 S.W.2d 621 (1929); *Huelsmann v. Stute & Co.*, 28 S.W.2d 387 (Mo.App.1930); *Yarnell v. Missouri Utilities Co.*, 23 S.W.2d 225 (Mo.App.1929). *cf. Hoover's Dairy, Inc. v. Mid–America Dairymen*, 700 S.W.2d 426 (Mo. banc 1985); *Snow v. Dick & Kirkman, Inc.*, 74 N.C.App. 263, 328 S.E.2d 29 (1985). The employer attempts to distinguish these cases by arguing that, here, the only eyewitness testified that the equipment was not energized at the time of the casualty. It argues, therefore, that the commission had to accept Winder's testimony, which it did not. The commission could accept the circumstantial evidence that the unit had been energized after Parker returned to work, and could place great reliance on Dr. Spindler's perception of an electrical burn. The evidence amply supports the finding of liability. There is no rule requiring the trier of fact to accept eyewitness testimony when circumstantial evidence indicates a contrary conclusion. This is all the more so when the eyewitness has given conflicting accounts.

The employer makes much of medical records showing that Parker had had pains in the chest and some abnormal findings on cardiac examinations over a period of years. No physician who saw him considered that he had a serious heart problem, and expert witnesses testified that it would be unusual for a man of his age to die suddenly of a heart attack. Electrocution, moreover, may kill by interfering with the rhythm of the heart so as to produce external signs consistent with acute cardiac arrhythmia, which was the probable cause stated on the death certificate. The commission could determine the weight to be given to Parker's medical history.

The award is further supported by the expert testimony of William Joseph Welch, an electrician who has experience in welding. He presented four possibilities as to how Parker might have been electrocuted. The claimants were not obliged to bind themselves to a precise theory. This is especially so in the light of Dr. Spindler's emphatic opinion. The employer's challenge to Welch's testimony as "biased" could be addressed to the commission, but not to the reviewing court.

The employer argues that the award is tainted because the Administrative Law Judge received in evidence a 600–page OSHA report to which several general objections are directed. There is no need to pursue the point in depth, because the award is amply supported by other evidence. *See Ford v. Bi–State Development Agency*, 677 S.W.2d 899 (Mo.App.1984). The general objections, furthermore, seem unsubstantial. The agency has the authority to enter industrial premises, to observe conditions, and to make reports. 29 U.S.C. § 657(a), (g). The inspector's notes of observations would be admissible. *Kastner v. Beech Aircraft Corp.*, 650 S.W.2d 312, 319 (Mo.App.1983). The general objection is inadequate if any part of the exhibit is admissible.

The employer also challenges the award of a 15% penalty pursuant to § 287.120(4), RSMo 1986, which authorizes such a penalty "[w]here the injury is caused by the failure of the employer to comply with any statute in this state or any lawful order of the division or the commission...." The statute found to be violated is § 292.020, RSMo 1986, providing that:

> The belting, shafting, machines, machinery, gearing and drums in all manufacturing, mechanical and other establishments in this state, when so placed as to be dangerous to persons employed therein or thereabout while engaged in their ordinary duties, shall be safely and securely guarded when possible; if not possible then notice of its danger shall be conspicuously posted in such establishments.

The Administrative Law Judge determined that the penalty should apply, pointing out that "the wire feeder rolls were not covered, and that when the feeder was energized, the exposed surfaces could deliver electric shock." The employer points to testimony, including that of Welch, that any cover would have to be removed before the tension could be adjusted. Thus it is argued that the

failure to provide a cover cannot be found to be the cause of the injury.

The claimants argue in support of the penalty that, if the feeder rolls cannot be covered during adjustment, then the statute requires a warning of the dangers, such as "a notice ... warning employees not to touch any of the metal parts with their hands while advancing wire by means of the stinger...."

 Our review, of course, is of the commission's award, and not specifically of the findings and conclusions of the Administrative Law Judge. We accord the commission the same deference that is due to the court's judgment in a non-jury trial and are obliged to affirm if there is basis in the record for the decision. The commission might have found that the general warnings about the dangers of electricity were not adequate to direct attention to the specific problems of the welding assembly, and that there should have been express warning about the dangers in adjusting tension while the unit is energized. The warning might suggest that the jog switch should be used to test adjustments whenever possible, in preference to tripping the trigger of the stinger, which would energize the exuding wire. Or it might be suggested that the stop button be pressed before knob adjustment was attempted. The commission might also find that the fraying of insulation was a violation of the guarding requirements and that this condition contributed to the accident. The employer had no program of inspecting the insulation on the cables for worn places. The purpose of the penalty is to encourage employers to comply with the laws governing safety. A provision for guarding machinery would ordinarily be thought of as protection against mechanical injuries, but the remedial statute should be construed with some breadth. Insulation is the appropriate protection against stray electric current. The employer does not persuade us of error in the assessment of the penalty.

*Gudde v. Heiman Grain, Inc.*, 830 S.W.2d 574 (Mo.App.1992), relied on by the employer, is not helpful because, there, the commission had declined to assess the 15% penalty. The reviewing court upheld the action of the commission.

The award of the Labor and Industrial Relations Commission is affirmed.