**Karan LOYD, Robert Paul Loyd, and Matthew Dean Loyd, Claimants–Respondents,**

v.

**OZARK ELECTRIC COOPERATIVE, INC., Employer–Appellant,**

and

**Missouri Electric Cooperatives' Insurance Plan, Insurer–Appellant.**

No. 22827.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 1, 1999.

Application for Transfer to Supreme Court Denied Oct. 21, 1999.

Application for Transfer Denied Nov. 23, 1999.

---

Rodric A. Widger, Andereck, Evans, Milne, Peace & Baumhoer, L.L.C., Springfield, MO, for Appellants.

Patrick J. Platter, Daniel, Clampett, Powell & Cunningham, L.L.C., of Springfield, MO, for Respondents.

PREWITT, Judge.

Robert Steven Loyd died while trying to repair with another lineman an underground pad-mounted transformer owned by his employer, Ozark Electric Cooperative, Inc., in Greene County, Missouri. His dependents filed a claim seeking death benefits under the Workers' Compensation Act and then later, a fifteen percent penalty pursuant to Section 287.120.4, RSMo 1994. They were awarded both, and the Employer and Insurer appeal. They contest only the assessment of the fifteen percent penalty.

Robert Steven Loyd and Steven Swearingen were employees of Ozark Electric Cooperative, Inc., a rural electric service cooperative. Loyd had been employed as an apprentice lineman for approximately six to nine months, having previously worked in line construction. Swearingen was a lead lineman, employed with Ozark Electric for some eleven years.

On the evening of July 4, 1994, both men responded to a power outage call at the Walnut Hills subdivision in Greene County. Its residents are provided electrical service via underground lines. Having replaced a blown fuse they believed to have caused the outage, they returned to the James River office. From there, they drove their separate vehicles to Swearingen's home to unload a wire spool. Upon their arrival at Swearingen's home, they were dispatched again to the same subdivision and informed that power had not been restored to all homes.

Returning to the subdivision after dark, they located the transformer they believed to be causing the problem along the eastern boundary, and determined that an elbow connection had burned and separated. The affected transformer was located/positioned some two feet from a metal chain link fence (industry standards require 10 feet of clearance), with its access panel facing the fence. It was mounted on a concrete pad (hence, "pad-mounted transformer") and was one of a series of transformers in an underground electrical distribution system. Typically, such a system distributes unreduced electrical voltage from one transformer to another transformer in a straight line without interruption or change in direction. The transformers in turn reduce electric voltage to the level of household current for residential homes.

Believing that repair of the elbow connection could be made after eliminating the power source elbow from a nearby transformer, they did so. They were working under the assumption that by shutting down power at that transformer, the electrical current flowing to the transformers to the south of it would also be terminated. Such was not the case here. The presence of a double, or "Y", elbow confused them. There was no indication visible on the equipment indicating that

power was distributed in two directions, one running to the north and another running to the south. In actuality, disconnecting one elbow at that point only succeeded in terminating the power running to the north of that transformer; power to the south of it had not been terminated.

Uncertain that the disconnection indeed terminated the power to the damaged transformer, the two returned to the damaged transformer, where they proceeded to test whether it was de-energized. As Loyd stood between the transformer and the metal chain link fence, holding a flashlight, Swearingen attempted to remove the plastic casing, thereby exposing the electrical wiring. Swearingen testified that at that time he saw a flash which burned his right arm. Loyd was struck by the voltage as it arced from the transformer to the chain link fence. He died later. The cause of death was "probable electric shock."

Loyd died at Transformer # 13–14, which is immediately south of Transformer # 11–12. A plat of the subdivision where the accident occurred shows a "takeoff pole" located in the northeast corner of the subdivision. The takeoff pole connects the main trunk of electric line to various transformers located within the subdivision. From the takeoff pole, the electric line then runs in north/south directions around the eastern and western boundaries of the subdivision, and in the middle. The lines connect to pad-mounted transformers, usually located at every other property line.

An electrical distribution system which runs in a straight line without interruption or change in route is a radial system. The electric lines in the subdivision where the accident occurred are designed for a radial system, with one critical exception. The "takeoff" pole fed electric current to Transformer # 11–12, but the current stopped there, it did not feed electric current to Transformer # 13–14, or other transformers south along the line. This meant that if the power were turned off at Transformer # 11–12, the transformers south of it would still be carrying electrical current.

Loyd's wife filed a claim under Section 287.240, RSMo 1994, with the Division of Workers' Compensation, seeking compensation and death benefits. An amended claim for compensation was subsequently filed, contending that Employer was also liable for a penalty of 15% of compensation under Section 287.120.4, RSMo 1994, for violation of Section 292.020, RSMo 1994.

Following a hearing held October 8, 1997, the Administrative Law Judge concluded that Employer's failure "to tag the cables in order to apprise employees of the direction of electric current and failure to train employees concerning the use of 'Y' elbows constituted a violation of Section 292.020, RSMo 1994 and that such violations were substantial factors towards the death of Loyd." The Division awarded Claimants the additional 15% penalty, and Employer appealed to the Labor and Industrial Relations Commission.

Adopting and incorporating the conclusions and rulings of the Administrative Law Judge, the Commission affirmed the award and decision. Employer and Insurer appeal the final award allowing compensation.

Our review of the Labor and Industrial Relations Commission's findings is limited to a review of questions of law. This court will modify, reverse, remand or set aside an award only if the Commission acted without or in excess of its powers, the award was procured by fraud, the facts found by the Commission do not support the award, or there was not sufficient competent evidence in the record to warrant the making of the award. Section 287.495, RSMo.1998. When reviewing the sufficiency of the evidence, this court is limited to determining whether the Commission's award is supported by competent and substantial evidence on the whole record. The evidence and inferences are reviewed in the light most favorable to the award, and the Commission's findings will be set

aside only when they are clearly contrary to the overwhelming weight of the evidence. *Akers v. Warson Garden Apartments,* 961 S.W.2d 50, 52–53 (Mo.banc 1998).

■ The review is conducted in two steps. First, we determine whether the whole record, viewed in the light most favorable to the decision, contains sufficient competent and substantial evidence to support the Commission's decision. If we find that it does, then the second step requires us to consider all the evidence, including evidence not favorable to the decision, to make a determination as to whether the decision is against the overwhelming weight of the evidence. *Putnam–Heisler v. Columbia Foods,* 989 S.W.2d 257, 258–59 (Mo.App.1999).

The Commission ruled in favor of the claimants, awarding compensation and an additional 15% penalty pursuant to Section 287.120(4), RSMo 1994, for violation of Section 292.020, RSMo 1994, requiring guarding of dangerous industrial machinery and equipment, or warning of the dangers when guarding is not possible. The Employer appeals, contending there was no competent and substantial evidence to support the commission's decision.

■ In this case, the Commission adopted the findings of the Administrative Law Judge (the ALJ). The ALJ's award, therefore, is reviewed as part of the Commission's decision. *See Reese v. Coleman,* 990 S.W.2d 195, 197 n. 2 (Mo.App.1999).

Appellants' first point claims the evidence did not support a finding that Section 292.020, the "guarding statute," was applicable to this case because: (a) it is not an "establishment" under the statute, and (b) the transformer is not a "machine" under the statute. If Section 292.020 is applicable, then Section 287.120.4 allows the compensation and death benefit to be increased by fifteen percent. These statutes are set forth below.[1]

■ When interpreting statutes, the primary role of the courts is to ascertain the intent of the legislature from the language used in the statute. Statutory words and phrases are given the plain and ordinary meaning, and this meaning is generally derived from the dictionary. When no ambiguity exists, there is no need to resort to rules of statutory construction. *Akers,* 961 S.W.2d at 53. An "establishment" is defined as an institution or a place of business. BLACK'S LAW DICTIONARY 546 (6th ed.1990). Applying this definition to Employer, it would be subject to the guarding statute.

Case law has construed Section 292.020 broadly and liberally to provide coverage to employees. In *Stoll v. Frank Adam Elec. Co.,* 213 Mo.App. 395, 240 S.W. 245, 246–47 (1922), the court interpreted the legislative intent behind this statute as follows:

> We think the Legislature, by the enactment of this statute, intended to afford the same protection to employees in "other establishments," while engaged in their ordinary duties, if such duties required them to work near unguarded machinery, as it did to employees in manufacturing or mechanical establishments, and that our legislators, in the use of the phrase, "and other establish-

---

1. Section 287.120.4, RSMo 1994, part of the Workers' Compensation Act, states:

    4. Where the injury is caused by the failure of the employer to comply with any statute in this state or any lawful order of the division or the commission, the compensation and death benefit provided for under this chapter shall be increased fifteen percent.

    The portion of Section 292.020, in question here, states:

    Equipment to be guarded.— The belting, shafting, machines, machinery, gearing and drums in all manufacturing, mechanical and other establishments in this state, when so placed as to be dangerous to persons employed therein or thereabout while engaged in their ordinary duties, shall be safely and securely guarded when possible; if not possible, then notice of its danger shall be conspicuously posted in such establishments.

ments," meant just what they said, and if they had intended otherwise they could easily have said so.

In *Stoll*, the definition of "other establishments" focused on the type of duties required of the employees. If employees are required to work near unguarded machinery, as did the employee in this appeal, then the employer can be within the group of "other establishments." Additionally, courts of this state have held that this statute governs a variety of businesses.

In *Tatum v. Crescent Laundry Co.*, 201 Mo.App. 97, 208 S.W. 139 (1919), the appellant argued that a laundry is not a "manufacturing, mechanical or other establishment," within the jurisdiction of the statute based on statutory construction. It argued that the doctrine of *ejusdem generis* applied in defining what the legislature meant when it used the words "other establishment." The doctrine, that the phrase includes only the same class as those preceding it in a line of descriptive words, would lead to the conclusion that the legislature intended to include only other manufacturing establishments. The court did not agree with this interpretation, noting that courts had applied this statute to "almost all classes of establishments where machinery is used." *Id.* at 142. The court also noted that:

> [T]he subject-matter of the statute is not manufacturing and mechanical plants, but the machinery to be guarded, and the words "in all manufacturing, mechanical and other establishments" are used somewhat incidentally in describing the things to be guarded. "Mechanical" is a term of very board [sic] meaning ... A mechanical establishment is broad enough, we think, to cover almost any plant or place where machinery is set up and operated ...

*Id.* at 143.

For other cases which have held various businesses liable under the guarding statute, see *Henderson v. Kansas City*, 177 Mo. 477, 76 S.W. 1045 (1903)(a waterworks plant was governed by the statute); *Pavlo v. Forum Lunch Co.*, 225 Mo.App. 167, 19 S.W.2d 510 (1929)(a restaurant); *Akers*, 961 S.W.2d at 53 (a business which owned and managed apartments).

A survey of the above cases leads us to conclude that the definition of "other establishments" is not limited to the class of manufacturing and mechanical establishments, but includes almost all classes of establishments where machinery is used. Employer in this appeal, a rural electric cooperative that furnishes electricity to its members, is within the definition of "other establishments" in Section 292.020.

Appellants also argue that the pad-mounted transformer for an underground electrical distribution system is not a "machine" subject to the provisions of Section 292.020. However, "[t]he term 'machine' has often been held to include every mechanical device or combination of mechanical powers and devises to perform some function or to produce a certain effect or result." *Lumatz v. American Car & Foundry Co.*, 217 Mo.App. 94, 273 S.W. 1089, 1090 (1925). A piece of equipment referred to as a welder, served the same purpose as a welding rod, in that it delivered electricity through cables that then energized a wire. That equipment, which does not generate electricity but transports it, was found to be a machine governed by the provisions of Section 292.020. *Parker v. Springfield Ry. Services*, 897 S.W.2d 103, 104–05 (Mo.App.1995). The welder is similar to the pad-mounted transformer in that neither piece of equipment manufactures an object, but nevertheless is "machinery" governed by Section 292.020. Point I is denied.

Appellants' Point II alleges that the Commission's decision was not supported by competent and substantial evidence in that: (a) the pad-mounted distribution transformer was not safely and securely guarded; (b) because Respondents did not plead the lack of a warning pursuant to Section 292.020, and the Commission

should not have considered such claim; and, (c) the evidence did not support a finding that the lack of a warning increased the dangerous nature of the pad-mounted transformer.[2]

We first address Appellants' complaint that the claim of a failure to warn pursuant to the statute was not pled, and that Respondents did not amend their claim to conform to the evidence. We should not, Appellants assert, consider the issue of failure to warn.

The claim filed by Respondents does make reference to Sec. 292.020, the "guarding statute," in which the requirement to warn is found. The claim states:

> The Claimants seek a penalty of 15% of any compensation due or awarded pursuant to Section 287.120.4 RSMo 1986, because the Employer violated the terms of Section 292.020 in that exposed and uninsulated energized electrical parts were dangerous to the deceased who worked about these parts in his ordinary duties and those parts were not securely guarded.
>
> The violation of Section 292.020 was the cause of the Employee's death.

Section 287.420 provides no proceeding shall be maintained unless written notice of the time, place and nature of the injury, and the name and address of the person injured shall have been given the employer, and that no defect or inaccuracy in such notice shall invalidate the same unless the Commission finds that the employer was in fact mislead and prejudiced thereby.

Proceedings under the Workers' Compensation Act are initiated by the filing of a Notice of Accident, just referred to in the preceding paragraph, and a claim need only be filed in the event of a dispute. *Groce v. J.E. Pyle*, 315 S.W.2d 482, 492 (Mo.App.1958). A claim need not state facts sufficient to state a claim for relief,

and the original jurisdiction of the Commission is ordinarily not dependent upon statements in a claim. *Id.*

In Workers' Compensation proceedings, substantial compliance with the provisions of the Compensation Act is ordinarily sufficient. "Procedural rights are considered as subsidiary and substantive rights are to be enforced at the sacrifice of procedural formality." Thus the claim or application for a hearing contemplated by the Workers' Compensation Act does not have to contain the usual elements of a petition in the civil action. *Groce*, 315 S.W.2d at 492. The record indicates Appellants were aware of the warning issue and were prepared to meet it.

Before testimony was offered, Appellants objected to an exhibit on numerous grounds, including that failure to warn was not included in the amended claim. We find no objection when Respondents offered evidence on this issue and Appellants offered testimony from an electrical engineer on the effect of "tagging or labeling." Lack of warning was an issue tried and was not excluded by the amended claim. We proceed to discuss that question.

The Commission held that the Appellants' testimony and evidence that guarding the transformer was not possible "misse[d] the point concerning the circumstances of the accident." The Commission focused not on the fact that the transformer was not guarded, but that the employees believed the transformer to be de-energized once they cut the power at a transformer north of the transformer on which they were working. Therefore, the issue which the Commission focused on was not the failure to guard as a violation of Section 292.020, but the failure to warn

---

**2.** Where the "notice of the danger" under § 292.020 should have been posted is not an issue here.

of danger once it had been determined that guarding was not possible.[3]

The tagging procedure was described by Employer's witness, Vernon Lawson, an electrical engineer, as consisting of "descriptive data provided on a cable or a piece of cable to tell you what it is." The cables on which the tags would be placed come out from the ground and run into the transformer. Earl Richards, an electrical engineer, testified that the cables at both Transformer # 13–14 and # 11–12 were not tagged.

The evidence in this case was that the standard protocol to de-energize a transformer was to cut the power one transformer north of the transformer to be repaired. Transformer # 11–12 was, however, unusual because de-energizing it did not de-energize the line south of it. The actions of the employees in this case were consistent with standard procedure servicemen would expect to perform on a "radial system." In this case, however, the current direction through Transformer # 11–12 was not part of the traditional "radial system." Further, the employees were unfamiliar with the "Y" elbow at transformer # 11–12, and were unaware of the method of de-energizing a "Y" elbow. The Commission found that Employer did nothing before the accident to apprise employees that Transformer # 11–12 was not part of a traditional "radial system." Additionally, the Commission found that the failure to "tag" the cables attached to the "Y" elbow would have apprised the employees of the direction of the current so that they could take steps to avoid electrocution while working on Transformer # 13–14.

Our review of the record supports the Commission's findings, and we find substantial and competent evidence that, because guarding of the transformer could not be accomplished, employer had a duty to warn, and failed in this duty. The Employer, therefore, violated the provisions of Section 292.020. Point II is denied.

■ Appellants' next point alleges the finding of proximate cause between the violation of the statute and the accident was not supported by substantial and competent evidence. The Commission found that failure to tag the cables to apprise the employees of the direction of the current and its failure to thoroughly train its employees concerning the "Y" elbows were substantial and contributing factors to Loyd's death. Appellants argue it was the employees' error that led to Loyd's death. While the employees could have taken steps to reduce the risk of injury (i.e. de-energize the proper transformer), it is also true that tagging the cables attached to the "Y" elbow could have removed the risk of electrocution. When two forces are actively operating, and each is sufficient by itself to bring about injury or death, the acts of one may be held to be a substantial factor and thus the proximate cause of the injury or death. *Elam v. Alcolac, Inc.* 765 S.W.2d 42, 172–75 (Mo.App.1988), *cert. denied,* 493 U.S. 817, 110 S.Ct. 69, 107 L.Ed.2d 36 (1989). Because the lack of a warning (tagging) was a cause of the subsequent electrocution of Loyd, the Commission could determine that violation of the statute was the proximate cause of his death. Point III is denied.

The last point in this appeal alleges error in admitting a report of the Occupational Safety and Health Administration (OSHA) because: (a) the report is inadmissible in that it was not evidence of a failure to comply with a state statute, division order or commission order; (b) the report is entirely hearsay; and, (c) that the report was predominantly evidence of remedial measures or irrelevant matters, and that if the report had been excluded,

---

**3.** The transformer was sufficiently guarded to protect third persons. The relevant question here, however, is whether it was guarded to protect those who work on it. The testimony was that in order to work on a transformer, the parts must be exposed and therefore it cannot be guarded.

Respondents would have been unable to meet their burden of proof.

■ Appellants' first argument under this point has no merit. The OSHA report was not admitted for the purpose of showing that a regulation of OSHA had been violated. The violation of the state statute was what subjected the Employer to the fifteen percent penalty, and other evidence of that violation was properly before the commission.

■ Appellants' second argument, that the OSHA report was inadmissible hearsay, also fails. Business records are an exception to the rule of hearsay as long as the requirements for establishing a business record are met. Section. 490.680, RSMo 1994 provides:

> **Records, competent evidence, when.** – A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.[4]

■ Investigation files qualify as business records, and are admissible as an exception to the hearsay rule if the information is collected pursuant to requirements of the statute that governs the agency. OSHA has the authority to investigate employers and to make reports pursuant to 29 U.S.C. § 657(a), (g). *See Waldron v. Ragland*, 716 S.W.2d 861, 862–63 (Mo.App.1986)(trial court is afforded great discretion in determining whether a document falls within the "business records" exception); *Rouse Co. of Missouri, Inc. v. Justin's, Inc.*, 883 S.W.2d 525, 530 (Mo. App.1994)(the bottom line regarding the admissibility of the business records is the discretionary determination by the trial court of their trustworthiness); and *Parker*, 897 S.W.2d at 107. We find the OSHA report met the statutory requirements to qualify as a business record and be admitted under this exception to the hearsay rule.

■ Appellants also argue that the report was predominantly evidence of remedial measures and was, therefore, inadmissible for the issues being tried. Remedial measures are generally not admissible for determinations of civil liability. *Diversified Metals Corp. v. Aaron Ferer & Sons*, 498 S.W.2d 783, 786 (Mo.1973); and *Bellistri v. City of St. Louis*, 671 S.W.2d 405, 407 (Mo.App.1984). However, remedial measures are admissible if they tend to prove, *inter alia*, the feasibility of precautionary measures that could have been taken. *Dillman v. Mo. Highway and Transp. Comm'n*, 973 S.W.2d 510, 512 (Mo.App.1998). *See also Smith v. Wal–Mart Stores, Inc.*, 967 S.W.2d 198, 207 (Mo.App.1998). Our review of the Commission's decision convinces us that the evidence of remedial measures found in the OSHA report was for the purpose of proving the feasibility of precautionary measures. We find no error in admitting the OSHA report into evidence. Point IV is denied.

The order of the Commission is affirmed.

GARRISON, C.J., and MONTGOMERY, P.J., concur.

---

4. Governmental entities are within the broad definition of business in § 490.670, RSMo 1994. *Mitchell v. City of Everton*, 655 S.W.2d 864, 866 (Mo.App.1983).